## In re EVANS et al.

No. 1227. Decided January 30, 1913 (130 Pac. 217).

1. CHAMPERTY AND MAINTENANCE—CONTRACTS BETWEEN ATTORNEY AND CLIENT—"CHAMPERTY." An agreement between an attorney and client, whereby the attorney agrees to pay all costs in a case which he shall prosecute for a contingent fee, is champertous; but an agreement to prosecute a cause for a contingent fee and advance to the client the costs and expenses, under the promise of the client to repay the same, is not champertous. [1] (Page 296.)

[1] Croco v. Oregon Short Line R. Co., 18 Utah, 311, 54 Pac. 985, 44, L. R. A. 285; Potter v. Ajax Min. Co., 19 Utah, 421, 57 Pac. 270; Id., 22 Utah, 273, 61 Pac. 999; Nelson v. Evans, 21 Utah, 202, 60 Pac. 557.

2. COURTS—JURISDICTION—SUBJECT-MATTER—CONSENT. Where the court has no jurisdiction of the subject-matter, the parties may not, by stipulation, confer it. (Page 299.)

3. CONTEMPT—POWER TO PUNISH—INHERENT POWER. Courts of general and superior jurisdiction possess the inherent power to punish for contempt. (Page 299.)

4. COURTS—RULES—POWER TO MAKE AND ENFORCE. Courts of general and superior jurisdiction have the inherent power to make, modify, and enforce rules for the regulation of the business before them. (Page 299.)

5. COURTS—RECORD—AMENDMENTS—POWER OF COURT. Courts of general and superior jurisdiction have inherent power to amend their record and proceedings, and to recall and control their process. (Page 299.)

6. ATTORNEY AND CLIENT—COURTS—JURISDICTION. Courts of general and superior jurisdiction have inherent power to control its officers, including attorneys as such, and to suspend, disbar, and reinstate attorneys. (Page 299.)

7. COURTS—INHERENT JURISDICTION—REGULATION. A court of general and superior jurisdiction may exercise its inherent powers and summary jurisdiction as the necessities of the case may require, within constitutional limits prescribed. (Page 299.)

8. ATTORNEY AND CLIENT—DISBARMENT—REINSTATEMENT—JURISDICTION OF COURT. A court of general and superior jurisdiction permanently disbarring an attorney has power to entertain an application for reinstatement for any reason satisfactory to it. (Page 300.)

9. ATTORNEY AND CLIENT—DISBARMENT—REINSTATEMENT—STATUTORY REGULATIONS. The general procedure in the Code for new trial or rehearing does not apply to an application by a disbarred attorney for reinstatement. (Page 300.)

10. ATTORNEY AND CLIENT—DISBARMENT—REINSTATEMENT. An application by a disbarred attorney for reinstatement is not restricted to a procedure in the nature of a bill of review or other equity or common law rules, since neither the original nor the appellate power of the court in respect to its statutory or common law or equity jurisdiction is exclusively invoked. (Page 300.)

11. ATTORNEY AND CLIENT—REGULATION OF ATTORNEYS—JURISDICTION OF COURTS. The summary jurisdiction of a court of general and superior jurisdiction over attorneys is inherent, continuing, and plenary, and exists independently of statute or rules of equity, and must be exercised as the necessity of the case requires to protect and maintain the integrity of the court, and to rebuke interference with the conduct of its business, and to control its officers, including attorneys. (Page 300.)

12. JUDGMENT—RES ADJUDICATA—SUMMARY JURISDICTION. The doctrine of *res adjudicata* may apply to any adjudication, resulting from the exercise of a summary jurisdiction. (Page 301.)

13. JUDGMENT—"RES ADJUDICATA"—JURISDICTION. The principle of *"res adjudicata"* relates to matters in defense which, to be availing, must be pleaded or presented in defense, and not to jurisdiction, and is largely based on the maxim that no one ought to be twice vexed for one and the same cause. (Page 301.)

14. JUDGMENT—RES JUDICATA—QUESTIONS CONCLUDED. A question actually and directly in issue in a former suit, and judicially passed on and determined by a court of competent jurisdiction, is conclusively settled between the parties or their privies, and cannot be again relitigated by them on the same or a different cause of action. (Page 301.)

15. ESTOPPEL—PRESUMPTIONS. Every presumption is against estoppels until the right to apply them affirmatively appears with certainty by the right record; and among the essentials of the doctrine of estoppel are parties, the actor and *reus*. (Page 301.)

16. ESTOPPEL—WAIVER—PLEADING. A party may waive matters giving rise to the right to apply the doctrine of estoppel; and he cannot be heard to invoke it, unless he pleads it in defense. (Page 301.)

17. ATTORNEY AND CLIENT—PROCEEDINGS FOR DISBARMENT—PARTIES. The parties to proceedings to disbar an attorney are the attorney and the court; for the proceeding involves matters wholly between the court and the attorney. (Page 301.)

18. JUDGMENT—RES JUDICATA—APPLICABILITY OF DOCTRINE. The doctrine of *res judicata* is inapplicable where the judgment relied on is of no force or effect. (Page 302.)

19. JUDGMENT—RES JUDICATA—VALIDITY OF JUDGMENT. A judgment disbarring an attorney, which is founded on matters not presented by the information, or founded on insufficient findings, or on errors of law apparent on the face of the record, cannot be relied on as *res judicata*, but may be vacated or modified. (Page 302.)

20. PLEADING—ISSUES—JURISDICTION. Pleadings are the judicial means of investing a court with jurisdiction of the subject-matter; and the court can judicially consider only what is presented thereby. (Page 302.)

21. JUDGMENT—PLEADINGS—VALIDITY. A judgment not supported by sufficient pleadings, or which, is beyond the pleadings and the findings, is void. (Page 302.)

22. JUDGMENT—VALIDITY—ERRORS APPARENT ON THE FACE OF THE RECORD. A judgment is void for errors of law apparent on the face of the record, such as showing the judgment or the methods

by which it was obtained to be at variance with the practice of the court, or contrary to fundamental principles of law. (Page 302.)

23. JUDGMENT—VALIDITY—ERRORS APPARENT ON THE FACE OF THE RECORD. A fact apparent from the mandatory record, which shows that fundamental law was disregarded in the establishment of a judgment, renders it void for all purposes, and subjects it to direct and collateral attack; and the court, on its own motion, may notice the defect. (Page 302.)

24. ATTORNEY AND CLIENT—DISBARMENT—JUDGMENT—VALIDITY. An information to disbar attorneys charged them with entering into a champertous contract. The referee did not find that the contract was champertous, and the court approved the findings as supported by the evidence, and made additional findings, based on the record of a civil action against the attorneys, in which the complaint alleged that the contract was champertous, and in which the attorneys interposed a demurrer; and such additional finding was at variance, not only with the findings of the referee, but also inconsistent with other additional findings of the court disclosing facts showing that the contract was not champertous. *Held*, that a judgment of disbarment was void. (Page 303.)

25. ATTORNEY AND CLIENT—DISBARMENT—INFORMATION—ISSUES. An information to disbar attorneys charged them with entering into a champertous contract to prosecute an action for a contingent fee, and to pay the costs of the litigation. The record of a civil action against the attorneys was attached to the information. The record disclosed a contract, alleging that the attorneys agreed to pay the costs of the litigation, and a demurrer thereto, and a judgment sustaining the demurrer. The attorneys denied the allegations of the information. *Held*, that the record of the cause attached to the information was not a part thereof, within the statute requiring the information to specifically state the matters charged; and the action of the court in assuming the truth of the allegations of the complaint attached was erroneous, in view of specific evidence that the attorney did not agree to pay the costs. (Page 306.)

26. ATTORNEY AND CLIENT—DISBARMENT—GROUNDS—EVIDENCE. Attorneys employed to prosecute an action for negligent death for a contingent fee were proceeded against in disbarment proceedings, on the ground that the contract was champertous as binding them to pay the costs of the litigation. They successfully prosecuted the action for the widow and children of decedent, and fully discharged their obligations to them. *Held*, that a finding that the attorneys violated their duty to the widow and children was unauthorized; and a judgment disbarring them, unless they paid to the widow and children a specified

sum within a specified time, disclosed error on its face, and was subject to direct or collateral attack, and could be vacated by the court, on the application of the attorneys. (Page 309.)

27. EVIDENCE—JUDICIAL NOTICE—RECORD. The court, in proceedings to disbar an attorney for making a champertous contract with a client to prosecute an action for a contingent fee, and to pay the costs of the litigation, may not take judicial notice of the record of a cause prosecuted by the attorney for another client, and assume that he had made a similar contract with such other client, merely because on the trial of the cause the adverse party requested the trial court to charge that there could be no recovery because of the champertous contract, and the refusal to so charge was approved by the court on appeal. (Page 312.)

28. ATTORNEY AND CLIENT—DISBARMENT—ISSUES. Where an attorney, in proceedings to disbar him, is charged in the information with a specific offense or offenses, it is not permissible to show other similar offenses, except to prove knowledge. (Page 314.)

29. JUDGMENT—VALIDITY—ISSUES—FINDINGS. Findings made without the issue and by methods at variance with the practice of the court do not support a judgment. (Page 314.)

30. CHAMPERTY AND MAINTENANCE—CONTRACTS—ATTORNEY AND CLIENT. A contract between an attorney, who had contracted to prosecute an action for a contingent fee of fifty per cent. of the recovery, and a third person, not a lawyer, to the effect that the latter should receive a third of the half of the recovery in consideration of his furnishing witnesses necessary to prosecute the cause, is not, in itself, champertous. (Page 315.)

31. ATTORNEY AND CLIENT—DISBARMENT—PROCEEDINGS—ISSUES. The court, in disbarment proceedings under Rev. St. 1898, secs. 120-124, 130, providing for the removal of attorneys for specified misconduct, and for proceedings on information for such removal, is called on to try only the matter charged in the information. (Page 318.)

32. ATTORNEY AND CLIENT—DISBARMENT—JUDGMENT—VALIDITY—"DUE PROCESS OF LAW." The court, adjudging, in proceedings to disbar an attorney, that the atorney was guilty of a crime not charged in the information, and without giving the attorney an opportunity to be heard, acted without jurisdiction, under the rule that judicial proceedings imply an accusation, a hearing before an impartial tribunal, and a judgment. (Page 325.)

33. JUDGMENT—ACTION FOR NEGLIGENT DEATH—DISTRIBUTION OF PROCEEDS—VALIDITY. A judgment of the district court, distributing the sum recovered therein for negligent death, is presumptively regular and proper, in the absence of any showing to the contrary. (Page 326.)

34. EXECUTORS AND ADMINISTRATORS—DECREE OF DISTRIBUTION—VALIDITY. A decree of distribution in probate proceedings, made after due notice by a court having jurisdiction of the subject-matter, is conclusive as to the fund, items, and matters covered by and properly included therein until set aside or modified by the court, or until reversed on appeal. (Page 326.)

35. ATTORNEY AND CLIENT—ACTION FOR NEGLIGENT DEATH—DISTRIBUTION OF PROCEEDS—DUTY TO CLIENT. A firm of attorneys was regularly employed to prosecute an action for negligent death, for the benefit of the widow and children of decedent, for a contingent fee of fifty per cent. of the recovery. An action instituted in the district court was prosecuted to judgment, and the court distributed the proceeds between the widow and children and the attorneys, giving the attorneys one-half and the widow and children one-half. There was nothing to show that the attorneys took any advantage of the widow and children inducing the making of the order of distribution. Held, that the attorneys were not guilty of appropriating to their own use money belonging to the widow and children. (Page 329.)

36. CHAMPERTY AND MAINTENANCE — CONTRACTS — ATTORNEY AND CLIENT. Where attorneys, solicited by the brother of a decedent to prosecute an action for negligent death in favor of the widow and children of decedent, contracted with the brother, representing the widow and children, to prosecute the action for a contingent fee, but without agreeing to pay the costs, and thereafter the brother was appointed administrator of decedent, and an action was prosecuted to judgment in his name, the contract was not champertous. (Page 330.)

37. CHAMPERTY AND MAINTENANCE—CONTRACTS—ATTORNEY AND CLIENT. A contract between attorneys, agreeing to prosecute an action for negligent death for a contingent fee, and a brother of decedent, an attorney, for a division of the contingent fee, in consideration of the brother rendering services in the prosecution of the action, is not champertous. (Page 334.)

38. CHAMPERTY AND MAINTENANCE—CONTRACTS. Champerty is a species of maintenance or a bargain with plaintiff to divide property sued for, if they prevail at law; whereupon the champertor is to carry on the suit at his own expense. (Page 337.)

39. ATTORNEY AND CLIENT—CONTRACT OF EMPLOYMENT—VALIDITY. Where a contract by attorneys to prosecute an action for negligent death for the benefit of the widow and children of decedent was valid under the circumstances, a contract between the attorneys and a brother of decedent, who was also an attorney, for a division between them of the contingent fee, in consideration of the brother rendering services in the prosecution of the action, was not prejudical to the interests of the widow and children, and was not invalid. (Page 338.)

40. ATTORNEY AND CLIENT—DISBARMENT—GROUNDS. A firm of attorneys, on solicitation, contracted to prosecute an action for negligent death for the benefit of decedent's widow and children. Pending action for the death, .the attorney for defendant made a settlement with the widow without the knowledge of her attorneys, who procured the setting aside of the settlement, and who thereafter prosecuted the action to judgment in a sum greatly in excess of the sum received under the settlement. *Held*, that the attorneys of the widow, though guilty of a technical infraction of the law, were not guilty of a wrong justifying disbarment. (Page 339.)

Petition of David Evans and Lindsay R. Rogers for a rehearing and a review and re-examination of the record and judgment in proceedings for their disbarment.

JUDGMENT OF DISBARMENT VACATED.

For former judgment see 22 Utah, 366, 62 Pac. 913, 53: L. R. A. 952, 83 Am. St. Rep. 794.

*Ogden Hiles* and *C. C. Dey* for petitioners.

*Waldemar Van Cott* and *E. B. Critchlow, amici curiae.*

STRAUP, J.

In May, 1900, an information or accusation was filed in this court to disbar David Evans and L. R. Rogers, members of the bar of this court, who theretofore were copartners in the practice of the law at Ogden, Utah. The matter was referred to a master or referee, who took the testimony and reported findings which exonerated Evans and Rogers of the charge. After a submission of the cause on the findings and the record, the court made additional findings, upon which, and the conclusions stated upon them, Evans and Rogers were adjudged guilty and deprived of the right to practice in any of the courts of this state until they paid into court the sum of $1793 for the use and benefit of one Mrs. Nellie Nelson and her minor children, the costs of the proceedings, $175 referee's fee, and a stenographer's fee of fifty-four dollars. It was further adjudged that, upon their failure to pay such sums within sixty days, they be permanently disbarred and their names stricken from

the roll of attorneys. The case, *In re Evans & Rogers,* is reported in 22 Utah, 366, 62 Pac. 913, 53 L. R. A. 952, 83 Am. St. Rep. 794, where the findings of the referee, the additional findings of the court, and its opinion and the judgment are set forth. Upon the filing of the decision Evans and Rogers complied with the order by paying the moneys as directed, and there the matter was at rest until in April, 1912, when they filed a verified petition in this court for a rehearing and a review and re-examination of the record and the judgment. The Attorney-General, and counsel theretofore appointed in the former proceedings as friends of the court and to conduct the prosecution, by written stipulation, consented that the petition, if the court were so advised, be entertained. Such counsel were thereupon reappointed by us as friends of the court. Upon their request that they be relieved from further participation in the matter, we appointed other counsel for such purpose, who consented to act, and who have rendered us much assistance.

The petition sets forth the former proceedings, the findings of the referee, the additional findings of the court, portions of its opinion, and the judgment. It is further averred that there are manifest errors apparent on the face of the record and judgment, in the particulars that the additional findings made by the court are inconsistent with each other; that material portions of such findings, as appear on the face of them, are based, not on the evidence, but upon misapplied legal fictions, and were made by a resort to methods at variance with the forms and practice of the court and contrary to law, and that they do not support the judgment; that upon the face of the findings the petitioners were not guilty of the charge; that the court adjudged them guilty of matters not within the issues, and upon which they had not had their day in court; and that the petitioners, since the rendition of the judgment, removed to the State of California, where Evans resumed the practice of the law, and where Rogers intends to do so, and that the judgment and the opinion, as they now stand, impeach and

prejudice, and will continue to impeach and prejudice, their good name and their social and professional standing, and hinder and embarrass, and will continue to hinder and embarrass, them in obtaining business and employment, especially in California and elsewhere, where the circumstances of the controversy are not known as they are in Utah. For these reasons the petitioners pray for a rehearing and reexamination of the record, and for an annulment or a modification of the judgment.

At the threshold counsel *amici curiae* advise us that, in their opinion, we are without jurisdiction or power to now review the record, or to set aside or modify the judgment; for, while the proceedings resulting in the judgment complained of were special and summary, nevertheless, the judgment is *res adjudicata* of the whole issue, and cannot be inquired into, except on a motion for new trial or rehearing as by law provided for rehearing of causes, or for legal reasons for maintaining a bill in the nature of a review which, as they advise us, are not sufficiently made to appear. Our attention, therefore, is called to the statute permitting the filing of petitions for a rehearing of causes determined by us on appeal, our rules requiring such a petition to be filed within twenty days after the filing of the opinion, and to the failure of the petitioners thereunder to invoke the action of the court, as they, within such time, might have done. and upon these considerations are we advised that they should not now be heard to complain and be permitted to invoke such action more than eleven years after the rendition of the judgment. We are further advised that if the petition be regarded as in the nature of a bill of review, and as designed to invoke in the broadest and most comprehensive manner all the powers possessed by us to correct error, nevertheless, since it is not grounded on newly discovered matter arising since the judgment, nor upon fraud, but on error, not of law appearing on the face of the record, but of fact and alleged errors resulting from a misconception or misapplication of the evidence, or conclusions deduced therefrom, the petition cannot be entertained on that theory.

On the other hand, it is contended by counsel for petitioners that the petition invokes the summary jurisdiction of the court, and not its original or appellate jurisdiction in respect of either its common law or equity jurisdiction, and therefore the general rules of criminal and civil procedure prescribed by the Code do not apply, and that such summary jurisdiction over its officers is inherent in the court and exists of necessity; that the exercise of such a jurisdiction is wholly different from that of the ordinary common law and equity jurisdiction, and, in the absence of direct legislative enactments or constitutional provisions, such summary jurisdiction may be exercised and such procedure adopted and such remedies applied as, of necessity, may be required to protect the integrity and dignity of the court and its officers in respect of matters wholly between the court and them; and that within such limitations the power of the court is complete, continuing, and plenary. Counsel for petitioners further contend that, though the petition be regarded as in the nature of a bill of review, yet, as alleged in the petition, there are manifest errors of law appearing on the face of the record for which not only such a bill will lie, but which also render the judgment a nullity, and subject to both direct and collateral attack.

Before passing to a consideration of these divergent views, it may be well first to notice, as have counsel, the nature and substance of the accusation and the admitted transactions as disclosed by the record out of which it arose, the findings of the referee, and the additional findings of the court upon which the judgment was based. In 1892 Charles A. Nelson, then a resident of Nevada, while transporting and accompanying live stock on a train of the Southern Pacific Railway Company, was, near Truckee, Cal., knocked off the train in a snowshed and killed. He left surviving him a widow and two minor children, also then residing in Nevada. Shortly thereafter they moved to Oakland, Cal. One of the deceased's brothers, Alfred H. Nelson, was a lawyer practicing his profession at Ogden, Utah. Another brother, Thomas Nelson, resided in Nevada. The widow commu-

nicated with Alfred, and employed him to inquire into the circumstances attendant upon the accident, and authorized him to employ such other counsel, and on such terms, as he thought proper to protect her interests, and to prosecute an action against the railway company for damages. Alfred consulted the petitioners, Evans & Rogers, a firm of lawyers of long experience and in active practice at Ogden, especially in the trial of causes. Upon such consultation, and upon the conclusion reached that a meritorious cause of action existed against the company and in favor of the widow and minor children, Alfred, in virtue of his authority from the widow, employed Evans & Rogers to assist him in the prosecution of such an action. The terms of the employment, as to attorney's fees, were a contingent fee of fifty per cent. of whatever amount might be recovered in the action, of which Evans & Rogers were to receive two-thirds and Alfred one-third; but, as Alfred was not an experienced lawyer in the trial of causes, it was agreed that his share of the labor in the litigation should mainly be to procure the attendance of witnesses, some of whom were beyond the jurisdiction of the court, or to obtain their depositions. It was also decided to commence the suit in the Utah courts at Ogden. As Mrs. Nelson resided in Oakland, and for convenience in the conduct of the business, Alfred was appointed administrator of the estate of the deceased by the probate court at Ogden. Thereafter the suit, in the name of the administrator against the railway company, was commenced in the district court at Ogden. The litigation which ensued was long and laborious. The case was tried five times in the district court, and was heard three times on appeal in the Supreme Court. Finally a judgment was recovered against the company in the sum of $10,000, which, when paid, with interest, amounted to $10,760. In December, 1893, and before the first trial of the cause, Alfred Nelson left Utah, and did not thereafter assist in the litigation. Before leaving, he desired to assign his interest in the contingent fee to his brother, Thomas Nelson, partly to secure Thomas for advances or loans of money which he had made to Alfred, and partly for the benefit of

Alfred, who was financially involved, and over whose interest Thomas was fearful Alfred's creditors might make trouble. Such an assignment was made and submitted to Evans & Rogers in the presence of both Alfred and Thomas. Evans & Rogers at first declined to recognize Thomas in the transaction, mainly for the stated reason that he was not a lawyer, and because of the understanding that Alfred, who was a lawyer, was expected, as such, to render some assistance in the case. Upon the solicitation of both Alfred and Thomas that Thomas be in some manner recognized, the conclusion was finally reached to do so; but, instead of the proposed assignment, it was thought advisable to make a direct contract between Evans & Rogers and Thomas Nelson. Thereupon a written contract, which is referred to as "Exhibit A," was entered into between Evans & Rogers and Thomas Nelson, as follows:

"Ogden, Utah, Dec. 2, 1893. We, the undersigned, agree to give Thomas Nelson one-third of one-half of any amounts which may be collected, whether on compromise or otherwise, in the case of Alfred H. Nelson, as administrator of the estate of Charles A. Nelson, deceased, v. Southern Pacific Ry. Co., in consideration of said Thomas Nelson furnishing witnesses necessary to prosecute said case. Evans & Rogers."

The dispute between Evans & Rogers and Thomas Nelson, which subsequently, and after the judgment against the railway company had been paid, arose over and grew out of this contract, is what gave rise to the proceedings of disbarment resulting in the judgment of which the petitioners now complain. When the judgment against the railway company was paid, one-half thereof, or $5380, was distributed by the probate court, and was paid to the widow and her minor children. The other half was retained by Evans & Rogers. Thomas Nelson, who was a witness in the case, was paid his witness' fees and all his expenses and disbursements. In addition to that, he thereafter, and in accordance with the terms of Exhibit A, also demanded of Evans & Rogers one-third of one-half of the amount recovered. They de-

clined to pay him any part thereof, for the stated reason that he had not performed his part of the contract, and had not procured the attendance of witnesses, or obtained their depositions, as by his contract he had agreed; and that upon his failure and refusal so to do, on their demand, they themselves, in order to procure the attendance of necessary witnesses and to take necessary depositions, advanced such costs and expenses at the request of the widow, and upon an agreement with her that she should repay them, regardless of the outcome of the litigation, all of which were subsequently repaid to them by her. Thomas Nelson, of course, claimed that he had performed, and therefore demanded one-third of one-half of the recovery. Upon the refusal of Evans & Rogers to pay it, Thomas Nelson sought an attorney who had represented other railway companies in numerous suits prosecuted by Evans & Rogers and defended by him, and between whom and Evans & Rogers a strained and unfriendly relation then existed growing out of such litigations. Thomas Nelson submitted to him a copy of the contract, Exhibit A, and requested him to bring suit against Evans & Rogers for a recovery. The attorney advised him that, in his opinion, the contract was champertous, and for that reason no recovery could be had. Thomas nevertheless insisted that the suit be commenced, and upon such direction one was commenced by him against Evans & Rogers. The action was bottomed on the contract, Exhibit A, Nelson's compliance with and Evans & Rogers' breach of it. But in the complaint it was also alleged, by way of inducement, as testified to in the disbarment proceedings by Nelson's attorney, that Evans & Rogers had entered into an agreement with Alfred H. Nelson, the administrator, by the terms of which the administrator had agreed to pay and they to accept one-half of whatever sum might be recovered against the railway company, in consideration of services to be rendered by them in the litigation and their paying and discharging "all taxable costs incurred and the costs incident to procuring the attendance of witnesses and all other costs that might be incurred in the prosecution of the cause;" and then it was alleged that

thereafter Evans & Rogers entered into a contract with him (Thomas Nelson), as evidenced by Exhibit A; that he had performed all the conditions thereof on his part to be performed; and that Evans & Rogers wrongfully refused, on his demand, to pay him one-third of one-half of the amount recovered.

When Thomas Nelson's suit was commenced, Evans and Rogers had dissolved partnership. Upon the service of summons on Evans he handed the copy to a Mr. Horn, an attorney at Ogden, and who had theretofore been in the employ of Evans & Rogers covering a portion of the time of the litigation against the railway company, and requested him to "look after it." Later Evans informed Rogers what he had done in that regard. Horn, without consulting either Evans or Rogers, interposed in their behalf a general demurrer to the complaint for want of facts. In no other way was the question of champerty or illegality of the contract, as alleged in the complaint, pleaded or raised, except, on the hearing of the demurrer in the absence of Evans and Rogers, Horn, in support of it, urged that the complaint alleged a champertous contract, and for that reason no recovery could be had. Nelson's attorney did not seriously dispute the legal conclusion. The demurrer was sustained, and the action dismissed. Rogers, believing that the demurrer was a "time server," as also did Evans, and learning the reason for which the demurrer had been sustained, sought Nelson's attorney, stated to him that he did not desire to make any defense of champerty, offered to consent that the demurrer be withdrawn, the case reinstated, and asked that he be permitted to answer on the merits, and later proposed a written stipulation to that effect. As testified to by Nelson himself, the offer was communicated to him, but was declined on his attorney's advice that "it would not amount to anything," as the lower court would likely take the same view of the matter as before, and would not permit a recovery because of the character of the contract; and therefore he (Nelson) "proceeded with it to the Supreme Court to show up" Evans and Rogers and "to place them on record." Evans, learn-

ing of the offer, also expressed a desire to join in the stipulation, but was told by Rogers that it would not be accepted. A speedy appeal by Nelson was prosecuted to the Supreme Court. His counsel, in his brief, after referring to the allegations of the complaint and to the demurrer, submitted the case with the observation:

"The demurrer is general. It is submitted that the complaint states a cause of action, unless there is an illegality in the contract itself. There is no presumption that such is the case, and there is no presumption, certainly, that the defendants rely upon such defense." Horn, at Rogers' request, withdrew his appearance for him in the Supreme Court, but after he had filed a brief on behalf of both Evans and Rogers, in which all that he said was that the complaint "does not state facts sufficient to constitute a cause of action," and cited cases, including the case of *Croco v. O. S. L. R. Co.,* 18 Utah, 311, 54 Pac. 985, 44 L. R. A. 285, relating to champertous and illegal contracts. The judgment of the court below was affirmed. The case is reported in *Nelson v. Evans & Rogers,* 21 Utah, 202, 60 Pac. 557.

A reading of the case shows that the court did not hold that the contract, Exhibit A, between Thomas Nelson and Evans & Rogers was champertous or illegal, but held that the contract, as alleged in the complaint, was champertous and illegal. Such holding, however, was based, as appears by the opinion in that case, solely upon the ground of the allegations that Evans & Rogers had agreed to pay and discharge the costs and expenses of the litigation in the suit against the railway company. But the terms of such an agreement to pay and discharge such costs and expenses were alleged to be terms of an agreement between the administrator, Alfred H. Nelson, and Evans & Rogers. They were not alleged to be terms of, nor are they contained in, the agreement, Exhibit A, between Thomas Nelson and Evans & Rogers.

The agreement between Alfred H. Nelson and Evans & Rogers, as alleged in that complaint, is champertous and illegal. (*Croco v. O. S. L. R. Co.,* 18 Utah, 321, 54 Pac. 985,

44 L. R. A. 285.) The agreement between Thomas Nelson and Evans & Rogers, Exhibit A, is not champertous. *Potter v. Ajax Min. Co.,* 19 Utah, 421, 57 Pac. 270; *s. c.,* 22 Utah, 273, 61 Pac. 999, where it was held by this court that contracts for contingent fees, based on a moiety of the amount of recovery, are lawful; and that an attorney may lend or advance to his client moneys for necessary costs and expenses to carry on the litigation, when there is an express or implied understanding or agreement for the repayment of such moneys, and no agreement of indemnity against the client's liability to pay costs. And it was the contract, Exhibit A, which defined, and under it Thomas Nelson in fact claimed, his primary right and the corresponding primary duties of Evans & Rogers, and the delict or omission which violated them, and under which he in fact claimed he had performed, and with respect to which he in fact claimed the breach arose. Thus Thomas Nelson could have stated a good cause of action, founded upon his contract and a breach thereof, which would have been free of the charge of champerty or illegality; for let it be noticed that his complaint was held bad on the sole ground that it contained allegations showing terms of a contract whereby the defendants, Evans & Rogers, had agreed to pay and discharge all costs and expenses of the litigation referred to, terms of the alleged Alfred H. Nelson contract, but not of the Thomas Nelson contract. Nevertheless, Thomas Nelson, by way of inducement, first alleged that Evans & Rogers had entered into an alleged contract with the administrator, Alfred H. Nelson, which, as alleged, was impregnated with champerty, and then alleged that they thereafter entered into a contract with him, which within itself was not so tainted, and thereby unnecessarily, and either inadvertently or purposely, imported something odious into his complaint, which the court held defeated a recovery, and drove him out of court.

After the remittitur was sent down, Thomas Nelson's attorney, upon an affidavit of Nelson, presented to and filed in this court a written accusation or information to disbar Evans and Rogers. Thomas Nelson himself testified that

he made the affidavit and caused the disbarment proceedings to be instituted "out of revenge," and, as found by the referee, to force Evans & Rogers to pay him the money which he claimed was due him, believing, as he testified, that they would do so rather than "face the charge." The original information filed in the cause is lost. Upon an application on behalf of the petitioners for a substitution, supported by a verified petition and affidavits of those who averred and showed personal knowledge of the contents of the original information, and who, upon such knowledge, made direct and positive averments as to the substance and contents thereof, and especially as to all of the specifications of the charge therein contained, and upon service of notice and copies of such petition, affidavits, and proposed substituted information upon counsel who prepared, presented, and filed the original information, and upon counsel *amici curiae,* and the averments of such petition and affidavits and contents of such proposed substitution with respect to the specifications of the charge not having been in any particular disputed or controverted, and no objection having been made, and no other or different action requested, a substitution of the lost information was ordered. As shown by the substituted information, the specifications of the charge are that Evans & Rogers had (1) entered into a champertous agreement with the administrator, Alfred H. Nelson, in the suit against the railway company, by the terms of which they "undertook and agreed to prosecute said cause against the railway company to final judgment, and also to pay and discharge all the taxable costs incurred, and also the costs incident to procuring the attendance of witnesses, and all other costs that might be incurred in the prosecution of the cause," which terms of such contract, in such particular and as so alleged in the information, are the same as were alleged in the Thomas Nelson complaint, and (2) had afterwards, and on the 2d day of December, 1893, in connection with the foregoing contract, entered into another champertous contract, Exhibit A, with Thomas Nelson, heretofore fully set forth, to which information were attached and made a part

thereof, and as exhibits, a copy of the abstract of the record on the appeal in the Thomas Nelson Case, a copy of the brief, signed by Horn as attorney for Evans and Rogers, and a copy of the decision of the court on such appeal, true copies of which abstract and brief, as is averred in the substituted information and affidavits, are now on file in this court and contained in volume 62 of Abstracts and Briefs, file no 1,191 of the records and files of this court, and the official decision itself contained in 21 Utah, 202, 60 Pac. 557. And upon the whole record, including the briefs as filed in the original proceedings, a full and complete stenographic report of all the proceedings had and evidence taken before the referee, and as reported by him, which briefs and transcript of such proceedings and evidence are preserved and now on file, the findings of the referee, and the additional findings of the court, as set forth in 22 Utah, 368, 62 Pac. 913, 53 L. R. A. 952, 83 Am. St. Rep. 794, it also clearly appears that the original information contained no specification of charges other than or different from those set forth and contained in the substituted information.

Now, recurring to the question of our jurisdiction to at this time entertain the petition for the prayed relief: If we have no such power, the stipulation filed by counsel cannot confer it. There is no direct legislation or constitutional provision which, in express terms, prescribes our power in such particular; nor is there anything which limits, restricts, or prohibits it. It is undoubtedly true that courts of general and superior jurisdiction possess certain inherent powers not derived from any statute. Among these are the power to punish for contempt, to make, modify, and enforce rules for the regulation of the business before the court, to amend its record and proceedings, to recall and control its process, to direct and control its officers, including attorneys as such, and to suspend, disbar, and reinstate attorneys. Such inherent powers of courts are necessary to the proper discharge of their duties. Such powers and summary jurisdiction may, within certain limits, be abridged,

and the procedure with respect to the exercise of them be regulated, by legislation. But, unless so prescribed and limited, a constitutional court of general and superior jurisdiction may exercise such inherent powers and summary jurisdiction as the necessity of the case may require, and in manner comporting with a proper discharge of its duties in the premises.

Confessedly, had the petitioners been permanently disbarred and their names stricken from the roll, the power exists to entertain a petition or an application for complete reinstatement for any reason satisfactory to the court. (4 Cyc. 917.) That cannot be doubted. Such applications have frequently been made and granted, but generally based on matters arising subsequent to the disbar- **8, 9, 10** ment. But, manifestly, the general procedure provided by the Code for a new trial or rehearing of causes does not apply; nor is the application otherwise to be restricted to a procedure in the nature of a bill of review, or other equity or common law rules; for neither the original nor the appellate power of the court in respect of its statutory or common law or equity jurisdiction is exclusively invoked.

The summary jurisdiction which the court has over its attorneys as officers of the court is also invoked. That jurisdiction is inherent, continuing, and plenary, and exits independently of statute or rules of equity, and **11** ought to be assumed and exercised as the exigencies and necessity of the case require, not only to maintain and protect the integrity and dignity of the court, to secure obedience to its rules and process, and to rebuke interference with the conduct of its business, but also to control and protect its officers, including attorneys.

True the doctrine of *res adjudicata* may apply to an adjudication resulting from the exercise of a summary as well as a formal jurisdiction. But the principle involved does not go to jurisdiction, but relates to matters in defense which, to be availing, must be pleaded or presented in defense, not to jurisdiction, but in bar. The doctrine is a principle of

repose, and is largely based upon and in accordance with the maxim that no one ought to be twice vexed for one and the same cause; and, as stated by Wells in his work on *Res Adjudicata* (section 2), chiefly bears upon the parties and others privy to the immediate parties, and restrains them from litigating anew such matters as have previously been drawn into controversy between them or those representing them, and have been authoritatively decided by a competent tribunal. Hence the oft-repeated declaration that a fact or question actually and directly in issue in a former suit, and there judicially passed on and determined by a court of competent jurisdiction, is conclusively settled, so far as concerns the parties, and cannot be further litigated in a future action between them or their privies, in the same or in another tribunal, upon the same or a different cause of action. The doctrine is in the nature of an estoppel.

Estoppels are odious, and every presumption is against them until the right to apply them affirmatively appears with certainty by the right record. Among the essentials of the doctrine are parties, the actor and the *reus*. They may waive the matters giving rise to the right to apply it, and cannot be heard to invoke it, unless pleaded in defense.

Who are the parties to the disbarment proceeding? The petitioners on the one side; but who on the other? Certainly not the informant, nor Thomas Nelson. If there were another party, within the meaning of parties essential to the doctrine, it was the court; for the proceeding involved matters wholly between the court and the petitioners. Let it be conceded that the petitioners, if twice vexed by the same cause, could successfully interpose the plea. So, too, must it be conceded that they could waive it, and could not be heard to apply and invoke it, unless pleaded in defense and in bar. Let it be conceded that the court, too, might invoke it, as is now suggested should be done. But it also can waive it. Why should the court here

invoke an estoppel, an odium of the law, in dealing with a matter which wholly concerns the court and its officers?

But aside from these considerations, and upon the further views entertained by us as to the nullity of the judgment, the doctrine is inapplicable; for a judgment of no binding force or effect is not *res adjudicata* of anything. There is no more reason for a holding that an order or judgment growing out of disbarment proceedings, and founded on matters not presented by the accusation or infor- **18, 19** mation, and not within the issues, or founded on conflicting or insufficient findings, or upon other errors of law apparent on the face of the record, may not in such particular be inquired into and modified or vacated upon an application invoking such action, than for a holding that a judgment in an ordinary action may not, by a bill of review or other remedy other than by a direct proceeding prescribed by the Code for a new trial or rehearing, be vacated or modified for errors of law apparent on the face of the record.

It is fundamental that pleadings are the juridical means of investing a court with jurisdiction of the subject-matter to adjudicate it; and that a court can judicially consider only what is presented by the pleadings. A cause **20-23** of action depends upon allegations, and what is not juridically presented cannot be judicially considered or decided. A judgment not supported by sufficient pleadings must fall. So must, also, a judgment which is beyond the pleadings and the findings. So, too, must a judgment fall for other errors of law apparent on the face of the record, such as showing the judgment or the methods by which it was obtained to be at variance with the forms and practice of the court, or contrary to well-recognized principles and fundamentals of the law. A fact apparent from the mandatory record showing that fundamental law was disregarded in the establishment of the judgment will render it null and void for all purposes. And a judgment founded upon such a record is subject both to direct and collateral attack, and will, *sua sponte,* be noticed by courts and acted upon by

them without regard to the wishes or the relation of the parties named upon the record.

We have already referred to the substance of the information. With respect to the alleged contract between Alfred H. Nelson and Evans & Rogers, the referee, in finding No.. 5 (22 Utah, 369, 62 Pac. 914, 53 L. R. A. 952, 83 Am. St. Rep. 794), found:

"That the said Alfred H. Nelson employed Evans & Rogers to prosecute said claim against said railway company, and the said Evans & Rogers and Alfred H. Nelson agreed to prosecute 'such action' for a contingent fee of one-half of the amount recovered;" and in finding No. 6: "That Evans & Rogers and Alfred H. Nelson entered into a contract, by the terms of which Evans & Rogers were to receive and retain two-thirds of the one-half of the amount recovered against the Southern Pacific Railway Company, and the said Alfred H. Nelson was to receive one-third of the one-half of the amount recovered of said company, which amount Evans & Rogers agreed to pay him for his services in said case, including the production of witnesses for the prosecution."

It is thus seen that the referee, in finding the terms of the Alfred H. Nelson contract, did not find that the petitioners had agreed to pay or discharge any of the costs in the suit against the railway company, and as the terms of that contract were alleged in the information or in the Thomas Nelson complaint. These findings the court did not disapprove, but asserted were supported by the evidence. (22 Utah, 372, 62 Pac. 913, 53 L. R. A. 952, 83 Am. St. Rep. 794.) At the trial before the referee it was shown that that contract with other property was unavoidably destroyed by fire; but Alfred H. Nelson, for the prosecution, gave testimony with respect to its terms, as also did Evans and Rogers. All testified in that respect as found by the referee, and not otherwise; nor was there any evidence to show that Evans and Rogers, or either of them, agreed with Alfred H. Nelson, or with anyone, to pay or discharge the costs or expenses of any kind, as alleged in the Thomas Nelson complaint or

in the information. That is admitted. Nevertheless, the court, after the submission of the cause, by its additional finding No. 8 (22 Utah, 374, 62 Pac. 913, 53 L. R. A. 952, 83 Am. St. Rep. 794), found that an agreement was made between Alfred H. Nelson and Evans & Rogers, by the terms of which they had agreed to pay and discharge all costs, as alleged in the Thomas Nelson complaint; but, as manifestly appears on the face of such additional finding, such finding of fact was not based on the evidence, but on a legal fiction, and upon an assumption of an admission by failure of denial.

The court, after finding that the abstract of the record on appeal in the Thomas Nelson Case, containing, among other things, the complaint in that action, was attached to and made a part of the information, then, by additional finding No. 8, found that "the complaint (in the Thomas Nelson Case) also alleged that in the contract with Alfred H. Nelson 'Evans & Rogers undertook and agreed to prosecute said cause against the railway company to final judgment, and also to pay and discharge all the taxable costs incurred, and also the costs incident to procuring the attendance of witnesses and all other costs that might be incurred in the prosecution of the cause.' These allegations were admitted by the demurrer to said complaint, and are not denied by respondents in their answer to the information or contradicted by the evidence."

It is thus seen that the court, by such additional finding, made a finding with respect to the terms of the alleged Alfred H. Nelson contract which contradicted the findings of the referee on that subject, which referee's findings the court declared were "supported by the evidence;" and, as manifestly appears on the face of it, the court made such additional finding, not on the evidence, but, at least partly, on the legal fiction that a demurrant, for the purposes of the demurrer, admits all material and properly pleaded allegations of the pleading demurred to, and extended and applied the fiction, not only to material and properly pleaded allegations, but also to immaterial and unnecessary allegations,

and further applied and extended it, not only for the purposes of the demurrer in testing the legal sufficiency of the complaint demurred to, but also as a rule of evidence and as conclusive admissions of fact in a subsequent and wholly independent cause or proceeding involving different issues and between different parties, and so extended and applied it as to contradict the evidence and to displace the truth as indisputably and confessedly shown by the evidence. That the making of such an application of the fiction was a misconception and misapplication of it, and making it the basis of a finding was at variance with the forms and practice of the court and contrary to fundamental principles, cannot be doubted. A finding which, on its face, was made in that manner no more supports a judgment founded upon it than would a verdict of a jury which manifestly shows it was made up and rendered by some process or method at variance with the forms and practice of the court and contrary to law. Furthermore, such additional finding No. 8, as appears on the face of the findings themselves, is not only at variance with the findings of the referee, but is also inconsistent with the third and fifth additional findings of the court (22 Utah, 373, 62 Pac. 913, 53 L. R. A. 952, 83 Am. St. Rep. 794), which are to the effect that a portion of the costs were advanced by Evans & Rogers not under an agreement with Alfred H. Nelson, by the terms of which the petitioners had agreed to pay and discharge the costs, but under an agreement with the widow, by the terms of which she had agreed to repay the same to them, an agreement under the authority of *Potter v. Ajax Min. Co.*, not champertous, and that she repaid them all the moneys so advanced, and "paid all of the expenses of the litigation, as far as Evans & Rogers are concerned."

It, however, is suggested that, since the abstract of the record on appeal in the Thomas Nelson Case, containing, among other things, the complaint in that case, was attached to the information and made a part thereof, and since, as found by the court, the allegations of that complaint were

admitted by the demurrer, and were "not denied by respondents in their answer to the information, or contradicted by the evidence," such allegations in the Thomas Nelson complaint with respect to the petitioners' alleged agreement in the Alfred Nelson contract to pay and discharge the costs and expenses, and as in that complaint alleged, the very essence of the charged offense of champerty, were not put in issue. The portion of the answer referred to is set forth in 22 Utah, 374, 375, 62 Pac. 913, 53 L. R. A. 952, 83 Am. St. Rep. 794. Certainly from that no conclusion of such an admission is permissible; nor is it otherwise deducible upon the record. The statute requires the accusation or information itself to be in writing, and to specifically state the matters charged, and to be verified. Such an information was filed. The denial may be oral and without oath. It is manifest that such copies of the abstract of the record and the opinion of the court in the Thomas Nelson Case were attached to the information, not as substantive charging portions of the information, nor as having the effect of an attached copy of an instrument or exhibit to a complaint constituting the foundation of the action or the thing sued on, and where, as in some such instances and in some jurisdictions, the allegations of the instrument so attached and sued on may be considered as a part of the pleading itself, but merely as illustrating the proceedings had in the Thomas Nelson Case, and as showing the disposition of it. That the attached exhibits here could have no other purpose and have no other effect, and cannot be regarded as the foundation of the action, nor as instruments sued on, needs no argument. To say that such an attached abstract of the record, briefs of counsel, and opinion of the court may be regarded as substantive charging portions of the information, and thus the matters charged left to be gathered by reference to and upon research of the attached exhibits, is to do violence to the requirement of the statute and the well-settled rule that the information be specific and definite with respect to the matters charged constituting the offense. The petitioners did not deny the

proceedings or disposition of the case as exhibited by the attached copy of the record and the opinion of the court; nor did they deny that the copies so attached were true or correct copies of such abstract, brief, and opinion. But to say that they thereby specifically admitted every matter or thing declared or asserted to such record, brief, and opinion —for it cannot be said that they were required to specifically deny one any more than another—is to carry the doctrine of judicial admissions quite beyond the adjudicated cases. The petitioners, of course, were required to plead to the information or accusation. This they did. No claim is made that their plea or answer did not put in issue every material allegation alleged in the accusation or information, except as to the making of the contract, Exhibit A. The making of that contract was expressly admitted. But, as clearly appears by the record, the making of the Alfred H. Nelson contract as alleged in the information or in the Thomas Nelson complaint was not admitted. And no claim or pretense of any such an admission is suggested, except as resulted from the petitioners' demurrer to the Thomas Nelson complaint and by their failure in their answer to the information to specifically deny, not the allegations of the information, but the allegations of the Thomas Nelson complaint as contained in the abstract of the record attached to the information as an exhibit.

Since the terms of the Thomas Nelson contract, as alleged, were expressly admitted, if therefore, it was thought that the terms, as alleged, of the Alfred H. Nelson contract were also admitted, the only other issue of fact presented by the information, it is difficult to perceive on what theory a reference was made of the case to take testimony and report findings. But on the record there is a most conclusive answer to the suggestion or contention of any such an admission. The whole case, as indisputably shown by the record, was tried and submitted on the theory that all of the allegations of the information or accusation were put in issue. At the threshold of the trial before the referee, and upon observations of counsel for the prosecution as to the issues,

counsel for the accused stated: "The issue arises from your charges, and it devolves upon you to produce your proof, if you have any, to sustain them." This view was accepted by the referee and by counsel for the prosecution, and the latter thereupon put in evidence a copy of the abstract of record, brief of counsel, and the opinion of the court as attached to the information, made proof of and put in evidence the contract, Exhibit A, and called witnesses, as heretofore shown, to give testimony, as did also Evans and Rogers, with respect to the terms of the alleged Alfred H. Nelson contract. Not only did counsel and the petitioners so treat and regard the alleged terms of the Alfred H. Nelson contract as in issue, but so also did the referee and the court, for both made findings with respect to them; the referee on the evidence; the court on legal fictions. The referee found as to the terms of that contract, and found them to be, not as alleged in the Thomas Nelson complaint, nor in the information, but as set forth in his findings Nos. 5 and 6, heretofore referred to. Those findings were approved by the court, and they in no uncertain language were most solemnly declared by the court to be "within the issues" and "supported by the evidence." (22 Utah, 372, 62 Pac. 915, 53 L. R. A. 952, 83 Am. St. Rep. 794.) And so they were. Of that there can be no doubt. Hence such additional finding No. 8 by the court, which manifestly, on the face of it, was not based on the evidence, but upon a misapplied legal fiction, and upon an erroneous assumption of no denial, manifestly, on the record, contrary to the pleadings and the theory upon which the case was tried and submitted, cannot support a judgment founded upon it. And on that finding and no other, rests the conclusion that Evans & Rogers had agreed with Alfred H. Nelson, or with anyone, to pay and discharge the costs and expenses of the suit against the railway company, and as alleged in the information or in the Thomas Nelson complaint.

There is, however, another and controlling reason why the judgment, on the face of the record, is a nullity. The opinion of the court, as will be seen by a reading of it, is

based, not upon considerations that Evans & Rogers had in any particular wrongfully withheld moneys from either Alfred H. or Thomas Nelson, or had in any particular failed to discharge, or had violated any obligation or duty to them, the alleged misconduct involved in the charge, but much of it is based on observations and considerations that Evans & Rogers had not been faithful in the discharge of their duties and obligations to their clients, the widow and minor children, and had wrongfully withheld moneys from them which belonged, and ought to have been paid, to them. And for that reason the judgment directed that Evans and Rogers pay into court the sum of $1793 for the use and benefit of the widow and children, and deprived Evans and Rogers of the right to practice until so paid, and upon their failure to do so within sixty days ordered that they be permanently disbarred and their names stricken from the roll. Such matters constituted the formal portions and directions of the judgment, (22 Utah, 388, 62 Pac. 913, 53 L. R. A. 952, 83 Am. St. Rep. 794.) The record discloses that no one had claimed that Evans & Rogers had wrongfully or otherwise withheld moneys from the widow or children, or otherwise had not fully discharged all of their duties and obligations to them, or had in any particular been unfaithful to or unmindful of them. Neither the widow nor children, nor anyone in their behalf, had claimed or demanded anything; nor had she or anyone complained that she or the children had not been paid all that was due them. No such matters were alleged in the information; nor was there any such issue otherwise raised or presented with respect to them. As has been seen, the controversy, both in the Thomas Nelson suit and in the disbarment proceedings, arose over a dispute between Thomas Nelson and the petitioners as to a division of the contingent attorneys' fee, or the amount thereof the petitioners had agreed to pay him. The referee found, and the court approved the finding, that the attorney's fee agreed upon in the cause against the railway company was fifty per cent. of the amount recovered. Of that amount Evans & Rogers were to have two-thirds, and

Alfred H. Nelson one-third, conditioned upon his procuring the attendance of the witnesses upon the trial. As he was about to leave and cease to further participate in the cause, the petitioners entered into an agreement with Thomas Nelson, whereby they agreed to pay him the one-third of such contingent fee, but also conditioned upon his procuring the attendance of the witnesses. Now, the petitioners contended that they were entitled to the whole of such contingent fee (fifty per cent. of the amount recovered) ; and that Thomas Nelson was entitled to no part thereof because of his nonperformance of his contract with them. Nelson contended that he was entitled to the one-third thereof upon his claim of performance, and further urged that the petitioners wrongfully deprived him of it, and when sued therefor defeated a recovery, not by taking advantage of the contract as it, in fact, existed between him and them, but as he alleged it in his complaint to have been induced by, or made in connection with erroneously or falsely alleged terms of a champertous contract with Alfred H. Nelson with respect to the petitioners' undertaking to themselves pay the costs of the litigation in the suit against the railway company ; and because they demurred him out of court upon such erroneous or false allegations he preferred the charges of disbarment. And in respect of such controversy and matters, and no other, was it claimed the alleged champerty existed and pertained and was the conduct of the petitioners in such particular charged.

It therefore is apparent that as to such a controversy the widow and children were not concerned. No one claimed that the amount of the contingent attorney's fee was unreasonable or excessive, or that the services rendered in the protracted litigation by the petitioners were not reasonably worth such sum ; nor were their relations to or dealings with the widow and children in any other particular complained of or questioned. The court, nevertheless, adjudged the petitioners guilty of misconduct in not faithfully safeguarding the interests of the widow and children, in violating duties and obligations, and in wrongfully withholding moneys be-

longing, to them—"put into their own pockets" $1793 be-
longing to them—and ordered and adjudged that they be
deprived of the right to practice until they paid such moneys
into court. An attorney should not so solemnly and sum-
marily be pronounced guilty of such gross disloyalty and in-
fidelity to his client, conduct constituting a criminal offense
(Rev. Stat. 1898, sec. 136), without a charge or an issue
and an opportunity to be heard upon it. The court made
such observations and reached such conclusion on the theory
that, since, as found by the court, neither Alfred H. nor
Thomas Nelson were entitled to any part of the contingent
fee, and to no part of the amount recovered against the
railway company, and since, as also declared by the court,
two-thirds of fifty per cent. of the amount recovered was
all that the petitioners were entitled to, either under their
contract or on a *quantum meruit,* not only as between them
and Thomas Nelson, had he performed, but also as between
them and the widow and children, therefore were the peti-
tioners ordered to pay the other one-third of such contingent
fee to them. Surely the petitioners, as between them and the
widow and children, were entitled to their day in court upon
the question as to their right to compensation, and the amount
thereof, either, under their contract of employment as found
by the referee, of a contingent attorney's fee of fifty per
cent., or on a *quantum meruit* for the reasonable value of
the services rendered by them. But the court summarily de-
prived them of such a hearing, and without pleadings or an
issue, or evidence, or an opportunity to be heard, judicially
considered and determined the rights of the petitioners in
such particular, when clearly no such question was juridi-
cally presented and could not judicially be considered or de-
cided. That such adjudication, on the face of the record,
is wholly unsupported by the information or accusation and
clearly without the issues, and hence the judgment founded
upon it a nullity and subject to attack whenever and wherever
brought in question, cannot be gainsaid.

In this connection it may be here noticed, and as found
by the referee (finding No. 9, 22 Utah, 370, 62 Pac. 913,

53 L. R. A. 952, 83 Am. St. Rep. 794), which finding, also, the court approved, that Thomas Nelson procured the attendance of but two witnesses other than himself "at one of the trials of said cause," the cause against the railway company. And it is shown that when the first trial resulted in plaintiff's defeat Thomas Nelson lost hope and failed and refused to procure the attendance of witnesses at the subsequent trials, and especially failed and refused to aid the widow to come from California to Utah to be a witness and in attendance upon the trial. Hence Evans & Rogers, at her request, and upon representations of her inability to defray her expenses, and upon an agreement that she should repay them, advanced her moneys at different times for that purpose, and also to procure the attendance of other necessary witnesses, of whom some were beyond the jurisdiction of the court, and to take depositions. Whatever different opinions may be entertained as to the propriety of an attorney so assisting his client, it certainly ought not to be said that the former was unfaithful to or derelict in not protecting the latter. And upon the record it is very evident that, had not the petitioners so assisted the widow, and had they not so perserveringly maintained and upheld the cause in her behalf, notwithstanding defeat upon defeat, neither she nor the children would have recovered anything.

And, lastly, the observations of the court, in the opinion (22 Utah, 380, 62 Pac. 913, 53 L. R. A. 952, 83 Am. St. Rep. 794), concerning a contract in the case of *Croco v. O. S. L. R. Co.,* 18 Utah, 311, 54 Pac. 985, 44 L. R. A. 285, between Croco and Evans & Rogers, his attorneys in that case, are also wholly without the issues. In the Croco Case the railroad company, represented by the same counsel who presented the original accusation in this cause, sought to avail itself against the charged negligence, and to defeat a recovery for injuries alleged to have been sustained by Croco by reason of such negligence, on the ground that Croco, the plaintiff, had entered into an alleged champertous contract with his attorneys, Evans & Rogers. The court held that the railroad company, being a stranger

to the contract, could not avail itself of such a defense, and could not on that ground "avoid a legal liability because the plaintiff and his attorneys may have entered into a champertous contract to enforce the obligation," and that the making of such a contract was wholly immaterial to the determination of the rights of the plaintiff, Croco, and the liability of the defendant railroad company. In the opinion in *Re Evans & Rogers,* 22 Utah, 380, 62 Pac. 913, 53 L. R. A. 952, 83 Am. St. Rep. 794, it will be seen that the court took judicial notice of the record of the Croco Case, and by a resort to such method found and stated the terms of the Croco contract, and observed that "the present instance is not the only one in which the respondents have made champertous contracts in the pursuit of their profession as attorneys." Thus the court, by such method, took the record of the Croco Case, to which the petitioners were neither real nor nominal parties, and where the question as to the terms and character of the contract was wholly immaterial, as binding admissions of fact against the petitioners in a wholly different proceeding involving entirely different issues and between wholly different parties. And this, too, as against the sworn testimony as to the terms of that contract and the intention of the parties that the petitioners were only to advance such costs, and not themselves to pay and discharge them. In the Croco Case, as can be seen from a reading of the opinion, it was not found nor determined that the petitioners had entered into such a contract as stated by the court in the opinion in Re Evans & Rogers. In the former case the railroad company requested the trial court to charge that the plaintiff, Croco, had "entered into a contract with his attorneys, whereby" they had agreed "to pay the costs required to be advanced to the clerk" and other costs, and for that reason the plaintiff was "not entitled to recover" anything in that action. The trial court refused to so charge; and this court, for the reasons heretofore given, affirmed the ruling. Why should it thereafter be said that such a proceeding constitutes an admission, even as to a party to the record, and as evidence against him as to the terms

or character of such a contract? If a litigant in a case re-
quests the court to charge upon assumed or asserted facts
stated in a request, and the court refuses to so charge, shall
it then be said that his adversary in the cause may thereafter
be held to a binding admission of such facts, and as evidence
against him? And shall it further be said that his attor-
ney or attorneys are also held to such a binding admission
of such facts, and as evidence against them, in a wholly
different proceeding and between different parties? The
mere statement of the proposition would seem to be self-
condemning.

But whatever may have been the terms or character of
the Croco contract, it is indisputably true that it was not
the transaction, nor any part thereof, mentioned or referred
to in the information. It is well settled that, when one is
charged in an information with a specific offense or offenses,
it is not permissible to show other similar claimed offenses,
except in cases where it is proper to prove a *scienter;*
and for weightier reasons is it improper to import
such matters into a case under the doctrine of judicial
notice. Here the court not only found and stated the terms
of the Croco contract by resorting to and invoking such doc-
trine (22 Utah, 380, 62 Pac. 913, 53 L. R. A. 952, 83
Am. St. Rep. 794), but also, by such method, inadvertently
made such fact and transaction one of the issues, and upon
it condemned the petitioners, unheard. On that question
they neither had their day in court in the Croco Case nor
in this.

Facts so found and findings so made without the issues,
and found and made by methods at variance with the forms
and practice of the court, and unauthorized by law, cannot
support a judgment. And for the reasons heretofore given
upon such a foundation rests the judgment under considera-
tion. That it works an irreparable and continuing injury
to the petitioners in the practice of their profession,
who, as the court stated in its opinion (22 Utah, 388,
62 Pac. 919, 53 L. R. A. 952, 83 Am. St. Rep. 794),
"have for a long time maintained a good standing before

the courts of this state, and are men of good morals," must be conceded. No good reason exists why such a judgment should be permitted to stand, which, though a nullity, yet so apparently and solemnly impeaches the "good standing" and "the morals" of the petitioners, and so injuriously affects them in their calling. If the petitioners were entitled to the demanded relief, had they, upon the grounds and considerations now urged, applied therefor within the time prescribed by the statute and rules of court for the making of applications for a rehearing, we see no good reason why they were not at any time thereafter, or are not now, entitled thereto; for length of years will not make that good which, on the face of the record, is a nullity.

From these views it necessarily follows that the judgment ought to be held for naught and vacated. The further question arises as to what further order or judgment in the premises should now be made. As has been seen, the Alfred H. Nelson contract, as alleged in the Thomas Nelson complaint and in the information, with respect to the petitioners' undertaking to themselves pay and discharge the costs in the suit against the railway company, is champertous and illegal; but confessedly there is no evidence to show the making of such a contract. The finding of the court on the legal fiction and the erroneous assumption of an admission by failure of denial—the only things pointed to in support of the making of such a contract—do not, as heretofore shown, support the conclusion that such a contract was made. The charge, then, with respect to the making of that contract, as to the petitioners' agreement to pay and discharge such costs, the gravamen of the charged offense of champerty, and as alleged in the Thomas Nelson complaint and in the information, is wholly unsupported.

The Thomas Nelson contract, Exhibit A, is not itself champertous. Neither was it, as heretofore shown, held champertous or illegal in the case of *Thomas Nelson v. Evans & Rogers, supra*. The contract, as alleged in the complaint in that action, was held champertous and illegal, but by reason of the allegations that the petitioners had

agreed to pay and discharge the costs referred to—terms, as heretofore shown, of the Alfred H. Nelson contract, but not of the Thomas Nelson contract. And from a reading of the opinion it would seem that, had the complaint not contained such allegations, the contract would not have been held champertous or illegal. And the only claim made that the Thomas Nelson contract, Exhibit A, is champertous is by reading into it the alleged terms of the Alfred H. Nelson contract with respect to the petitioners' alleged agreement to pay and discharge such costs, or by assuming that the Thomas Nelson contract was induced by, or substituted for, the Alfred H. Nelson contract in such particular. But since the charge and the allegations that the Alfred H. Nelson contract contained terms by which the petitioners had agreed to pay or discharge such costs, or that they otherwise had agreed to do so, are wholly unsupported, it follows that no such terms can be read into the Thomas Nelson contract; nor, for that reason, can it be said that it was substituted for, or induced or influenced by, or tainted with, any such terms or agreement to pay and discharge such costs. And since the Thomas Nelson contract is not itself champertous, and is not claimed to be so, it follows that the charge that the petitioners had entered into a champertous contract with Thomas Nelson is also wholly unsupported; and so the whole of the charge preferred against them by the information stands wholly unsupported.

Thus, to recapitulate, the case as to the charged offense of champerty is this: Thomas Nelson, in his suit against the petitioners, erroneously or falsely alleged terms of the Alfred H. Nelson contract with respect to their undertaking to themselves pay and discharge the costs in the suit against the railway company, a champertous contract, and then alleged that, in connection therewith, they made a contract with him, which is not itself champertous. By reason of such erroneous or false allegations they demurred him out of court. Then, instead of declaring on his contract as it in fact existed, or on a *quantum meruit*, he preferred charges of disbarment against the petitioners, alleging that they had

made a champertous contract with Alfred H. Nelson, as in his (Thomas Nelson's) complaint alleged, and that, in connection therewith, they also had made a champertous contract with him. The evidence wholly failed to show the making of such a contract with Alfred H. Nelson; and the findings of the referee, based on the evidence, showed that no such contract was in fact made. And hence both the evidence and the findings showed the allegations of the information and of the Thomas Nelson complaint, in such particular, to be untrue. The court nevertheless accepted them as true upon a misapplied legal fiction and an erroneous assumption of an admission, and thereupon found the petitioners guilty, and then pronounced a judgment against them on matters wholly without the issues.

These questions have all been fully presented and argued and submitted on this application. We do not see anything that can be presented in addition to what has already been presented on a further review of or rehearing on the record. It therefore is ordered and adjudged that the judgment heretofore made and entered in the case of *In re Evans & Rogers,* 22 Utah, 366, 62 Pac. 913, 53 L. R. A. 952, 83 Am. St. Rep. 794, be, and the same hereby is, annulled and vacated; that the charge or accusation preferred against them is not supported by any evidence; and that they, on the record, ought to be, and hereby are, exonerated and discharged. Such is the order.

McCARTY, C. J.

I concur. Rev. Stat. 1898, sec. 120, so far as material, provides:

"An attorney and counselor may be removed or suspended by the Supreme Court . . . for any of the following causes: . . . . (1) His conviction of felony or misdemeanor, involving moral turpitude, in which case the record of conviction is conclusive evidence. (2) · . . . Any violation of the oath taken by him or of his duties as such attorney and counselor. . . . (5) For any other act to which such a consequence is by law attached." Section 122

reads: "Proceedings to remove or suspend an attorney and counselor under the first subdivision of section 120 must be taken by the court on the receipt of a certified copy of the conviction. Proceedings in other cases may be taken by the court for matters within its knowledge, or may be taken upon the information of another." Section 123: "If the proceedings are upon the information of another, the accusation must be in writing." Section 124: "The accusation must state the matters charged, and be verified by the oath of some person to the effect that the charges therein contained are true." Section 130: "If the accused . . . deny the matters charged, the court must, at such time as it may appoint, *proceed to try the accusation.*" (Italics mine.)

The proceedings in question were instituted under sections 123 and 124; hence the only matter the court was called upon to try was the matter charged in the information. The entire record of the proceedings, with the exception of the original information upon which the proceedings were based, is before us, and clearly shows, independent of the substituted information filed in the cause, that the only charge made against Evans and Rogers was that of champerty. A demurrer was interposed by Evans and Rogers to the information. Typewritten briefs were filed, in which the question raised by the demurrer was stated and discussed by counsel for Evans and Rogers and by the Attorney-General, who appeared in the cause as counsel for the state. The Attorney-General, in his brief, illustrated the question presented by the demurrer in the following language: "The question for consideration in this case arises upon the demurrer to the information filed in this court, . . . charging respondents, Evans and Rogers, with having entered into a champertous contract, and to have been guilty of acts inconsistent with their office, etc. . . . This court has held, in the case of *Nelson v. Evans & Rogers,* 21 Utah, 203, 60 Pac. 557, that the contract made between the respondents and Nelson was champertous, and say in that opinion that 'counsel for the de-

fendants (defendants being respondents in this case), in support of the demurrer, claimed that the facts as stated in the complaint show that it does not state a cause of action, for the reason that it appears therefrom that the contract made as there alleged was champertous as between the parties thereto. . . .' The contract entered into by respondents having been declared to be champertous by this court, and it further appearing that the respondents avoided such contract on the ground of its champertous nature, *the question for determination is as to whether or not such conduct on the part of attorneys and counselors at law is sufficient cause for disbarment.*" (Italics mine.)

In the respondents' brief it was said: "The sole question for determination by the court is as to whether the information filed . . . states such a case as to lead the court to the conclusion that the respondents are unfit to practice at this bar. . . . The charge is that respondents *'entered into an unlawful, champertous contract* with Alfred H. Nelson, deceased.' And that *'they also entered into an unlawful and champertous contract with one Thomas Nelson.* . . .' In other words, upon this hearing *the sole question for consideration is as to whether, if an attorney enters into a champertous contract, that is a sufficient ground for disbarment.*" (Italics mine.)

In neither of the briefs mentioned is there any statement, suggestion, or word to the effect that Evans and Rogers, or either of them, had in their possession a dollar that belonged the estate of Charles A. Nelson, deceased, or to any of the beneficiaries thereof. Nor is there a suggestion that they, or either of them, was in any respect unfaithful to, or unmindful of, their client's interest in the case of *Nelson v. Southern Pacific Railway Company,* to which the contract in question referred, or that they were derelict in their duty to their clients in any other case or cases. The only question discussed in the briefs was the question of whether the contracts mentioned were champertous. Furthermore, the findings of fact proposed and submitted by the relator in the disbarment proceedings to the referee as the

findings in the case are among the papers on file herein, and they contain no statement, nor even a suggestion, from which it can be inferred that there was any claim made at the hearing, or at any other time, that Evans and Rogers, or either of them, was withholding or that they or either of them had in their possession, any fund or money belonging to the Charles A. Nelson estate. Those proposed findings refer only to facts having some bearing upon the question of champerty. Moreover, I have read the record containing a transcript of the evidence submitted on the hearing before the referee, and it shows that no claim was made, nor was it even suggested by the relator, the Attorney-General, or by counsel who were appointed as friends of the court at the hearing on the merits, that there was any money due from Evans and Rogers or either of them, or that they had any money or fund in their possession or under their control belonging to the Charles A. Nelson estate; nor was any evidence offered for the purpose of establishing any such fact. On the contrary, the record, as made before the referee, shows that the Attorney-General, who examined the witnesses called by the state and cross-examined the witnesses who testified for respondents (petitioners herein), endeavored to show that Thomas Nelson complied in every particular with the terms of the contract in question; and that he (not the widow and children of Charles A. Nelson) was in effect defrauded out of what was due him, because Evans & Rogers availed themselves of the alleged champertous character of the contract as a defense in his suit against them.

Thomas Nelson, who made and subscribed to the affidavit upon which the disbarment proceedings were instituted, was called as a witness by the state, and testified in part as follows:

"Q. Where did you get the affidavit from; who drew it up for you? A. Well, I think Mr. Williams drew the main part of it. . . . I sent him the facts first, and then he put it in form for me and sent it back to me. . . . Q. You sent him the facts to draw the affidavits from and

paid him seventy-five dollars; that is, to prepare the papers necessary to institute these proceedings? A. Yes, sir. . . . I wanted to place Mr. Evans and Rogers on record in the Supreme Court in this matter, and I told him that. Q. I understand you to say that you wanted to put Evans & Rogers on record in the Supreme Court? A. If they didn't settle with me. . . . Q. What you were anxious for was to collect under your contract? A. I wanted my money. . . . I brought proceedings against them with the hope of getting my money. . . . Q. Mr. Nelson, what satisfaction did you expect from placing Evans & Rogers on record in this case? A. Well, I don't know what you would call it, perhaps revenge. . . . They made a contract with me that they knew was illegal, and that they could make void and I could not collect, and then to take advantage of that contract and deny it and repudiate it after I had performed my part of it."

And I here remark, parenthetically, that the evidence of Thomas Nelson, above set forth, which is not disputed nor the effect of it in any sense neutralized by the testimony of any of the witnesses who testified in the case, shows that the disbarment proceedings, so far as he was concerned, was a case of blackmail to extort money from Evans & Rogers, which this court, in the opinion under consideration, held he was not entitled to receive. On this phase of the controversy this court, so far as material here, said that the services for which "Alfred H. Nelson was, under the agreement, to receive through Thomas Nelson, amounting to $1793.33, . . . were never rendered." And, again, the court said: "Neither Alfred H. Nelson nor Thomas Nelson was entitled to receive any part of the amount recovered under said contract."

On the filing of the report of the referee and the findings of fact made by him, together with a transcript of the evidence taken at the hearing, the Attorney-General and counsel appointed by, and who appeared in the cause as friends of the court, jointly filed a brief in the cause on behalf of the

state. The questions of fact discussed in the brief relate solely to the conduct of Evans & Rogers in entering into the alleged champertous contract, and the only legal questions therein discussed relate to the law of champerty. The only reference made in the brief to the matter which seems to have impelled this court to make additional findings and to render the judgment complained of is the following: "We think the respondents will not thank their counsel for the suggestion, in their brief, that the $1666.66 retained by them is the money of their clients, and not their own. This would be shunning Scylla and falling into Charybdis." Moreover, counsel who represented Thomas Nelson in his suit against Evans & Rogers, and who, after familiarizing himself with all of the facts, prepared the information upon which the disbarment proceedings were instituted, in integrity, legal learning, and ability stands high in his profession. In fact, in these respects he is regarded as the peer of any member of the bar of this court. It is apparent that it did not occur to him, either in the Thomas Nelson suit against Evans & Rogers, in which he sought to recover for his client the $1793.33, or in the disbarment proceedings, that this money belonged to the widow and children, and that Evans & Rogers were wrongfully withholding it from them. As I have stated, it was not claimed, nor even suggested, either by the Attorney-General or the eminent counsel who appeared in the case as friends of the court, that the widow and children, in the order and decree of distribution of the money recovered, did not receive every cent that they were entitled to receive. On the contrary, the only reasonable inference that can be drawn from the record is that all of the attorneys mentioned believed that if it were not for the alleged champertous character of the contracts mentioned Thomas Nelson would have been entitled to receive this money from Evans & Rogers. I invite attention to the attitude of counsel for Thomas Nelson and the attorneys - who appeared for the state merely for the purpose of showing that, even if it were conceded that the widow and children were entitled to the $1793.33 mentioned,

it nevertheless was a question upon which legal minds might well differ, and would have a material bearing on the question of good faith on the part of Evans & Rogers, who have persistently claimed that they were entitled to this money, and not Thomas Nelson. And I think the only reasonable inference that can be drawn from the record is that it never occurred to them that the widow and children were entitled to any more than the one-half of the judgment, which was paid them, until their attention was called to the brief filed in the case by their counsel, in which it was said: "If Thomas Nelson did not perform the consideration he promised, viz., secure the attendance of the nonresident witnesses, then Evans & Rogers, who, by that contract, were made trustees of one-third of one-half of the recovery, would have been grossly derelict in duty, violating the rights of their clients, the real beneficiaries, had they paid said Thomas." Regarding this statement of counsel this court, in the opinion, at page 383 of 22 Utah, page 918 of 62 Pac. (53 L. R. A. 952, 83 Am. St. Rep. 794), says: "The declaration in the respondents' brief that they were made trustees of that amount ($1793.33) for their clients, the real beneficiaries, *was evidently an afterthought.* At the argument before us, when the attention of respondents' counsel was called to that declaration, one of them, in the presence of one of the respondents, . . . notwithstanding his name was attached, as an attorney, to said brief, disputed that declaration, and declared that the respondents were entitled to retain the whole sum distributed to them." This declaration on the part of counsel was clearly a repudiation of the statement made in the brief. How, then, can it be said that Evans & Rogers admitted that they were derelict in their duty to their clients, and especially in face of their sworn testimony, wherein they claimed that they were entitled to the money distributed to them?

Neither the widow, nor any other person who was interested, either directly or indirectly, in the suit against the railroad company or in the disbarment proceedings, has ever suggested or even intimated, so far as shown by the

record, that the services contracted for by the widow were not fully performed in every particular. In fact, the loyalty of the attorneys, especially that shown by Evans & Rogers, to their clients, and the perseverance with which they prosecuted their claim against the railroad company under circumstances which the record shows were of the most discouraging character, was highly commendable. They advanced (loaned) the widow money to enable her to come from her home to Ogden and be present and testify in the cause at the several trials (five in number), and to pay other necessary costs and expenses. She was therefore advised that after the first trial was had Evans & Rogers, in effect, carried on the litigation for her and finally brought it to successful termination. For aught that appears in the record, the widow was perfectly satisfied with the manner in which the case was handled by Evans & Rogers and the outcome of it, and with the amount (one-half) of the judgment that was distributed to her and the children. It thus appears that this question—the assumed dereliction of duty on the part of Evans & Rogers to their clients, and upon which the final order in the opinion is based—was by this court, acting under a misconception of the facts, and by a misapplication of legal principles to the facts, imported into the case on its own motion, after the case was argued and submitted. In the opinion and judgment complained of it is said that Evans & Rogers "put into their own pockets" $1793.33 that belonged to their clients. The court therefore, without its power being invoked, went entirely outside of the issues and in effect adjudged Evans & Rogers guilty of a crime with which they had not been charged, and concerning which no evidence was adduced. For aught that appears in the record, the first intimation that Evans & Rogers received that they were accused of having appropriated to their own use their clients' money was when the opinion and judgment under consideration was announced by the court.

It requires no argument to show that the court, in effect, adjudging these parties guilty of a crime not charged in the

information, and without giving them an opportunity to be heard, acted without jurisdiction. "Courts have no power to adjudicate matters not involved in issues in the case before them; and such adjudications, if made, are not binding." (12 Ency. Pl. & Pr. 130, and cases cited in note.)

This court, in the case of *Maynard v. Insurance Ass'n,* 14 Utah, 458, 47 Pac. 1030, referring to certain facts found that were not within the issues, said:

"This, however, is a fact found outside of any issues raised in the pleadings; for nowhere in the complaint or answer does there appear any reference to such a by-law, nor is its existence shown anywhere in the transcript or abstract, except in the findings of fact. A fact found outside of any issue cannot be considered as supporting the judgment, because facts not in issue need not be found; and, if found, the finding is nugatory and without effect."

In Cooley's Constitutional Law, at page 232, the author, in defining the term "due process of law," quotes and adopts the language of an eminent advocate and statesman, as follows:

"By the 'law of the land' is most clearly intended the general law—a law which hears before it condemns, which proceeds upon inquiry, and renders judgment only after trial."

In Story, Const. (5 Ed.), sec. 1946, the author says:

"When life and liberty are in question, there must, in every instance, be judicial proceedings; and that requirement implies an accusation, a hearing before an impartial tribunal with proper jurisdiction, and a conviction and judgment, before the punishment can be inflicted." See 3 Words and Phrases, pp. 2244, 2245.

In *Windsor v. McVeigh,* 93 U. S. 274, 23 L. Ed. 914, the Supreme Court of the United States, speaking through Mr. Justice Field, says:

"Wherever one is assailed in his person or his property, there he may defend; for the liability and the right are inseparable. This is a principle of natural justice, recognized as such by the common intelligence and conscience of all nations. A sentence of a court pronounced against a party without hearing him, or giving him an opportunity to be heard, is not a judicial determination of his rights, and is not entitled to respect in any other tribunal."

There is another reason why that part of the opinion in which it is found that Evans & Rogers "put into their own pockets" and appropriated to their own use money that belonged to their clients cannot be upheld. An order or decree of distribution of the money recovered from the railroad company was made by the district court of Weber county. Under this decree one-half of the fund was distributed to the widow and minor children of Charles A. Nelson and one-half to Evans & Rogers in payment of their contingent fee due them by the terms of their contract 33, 34 with the widow of Charles A. Nelson, through Alfred H. Nelson. The law is well settled that a decree of distribution in probate proceedings, after due and legal notice, by a court having jurisdiction of the subject-matter, is conclusive as to the fund, items, and matters covered by and properly included within the decree until set aside or modified by the court entering the decree in the manner prescribed by law, or until reversed on appeal.

In 2 Black on Judgments, sec. 643, the author says:

"Thus, where a judge of probate has, by a decree, allowed a widow her distributive share in her husband's estate, the accuracy of the decree, as to the amount by law allowable to her, cannot be called in question collaterally."

And, again, in section 644, it is said:

"A decree of the probate court settling an executor's or administrator's final account and discharging him from his trust, after due legal notice, and in the absence of fraud, is conclusive upon all matters or items which come directly before the court, until reversed; and it will be presumed that it was founded upon proper evidence, and that every prerequisite to a valid discharge was complied with; nor can the decree be impeached in any collateral proceeding."

In 23 Cyc. 1055 the text, which is written by this same author, contains the following terse statement of the rule as applied to judgments generally:

"A judgment, rendered by a court having jurisdiction of the parties and the subject-matter, unless reversed or annulled in some proper proceeding, is not open to contradiction or impeachment in respect to its validity, verity, or binding effect, by parties or privies, in any collateral action or proceeding."

And on page 1061 the same author says:

"Orders and decrees of a surrogate, or of a probate or orphans' court, in any case in which jurisdiction has attached, are not open to contradiction or re-examination in any collateral proceeding."

And, again, on page 1063, after illustrating what constitutes a direct attack on a judgment, the same author says:

"On the other hand, if the action or proceeding has an independent purpose and contemplates some other relief or result, although the overturning of the judgment may be important or even necessary to its success, then the attack upon the judgment is collateral. This is the case where the proceeding is founded directly upon the judgment in question, or upon any of its incidents or consequences as a judgment, or where the judgment forms a part of the plaintiff's title, or of the evidence by which his claim is supported."

The order and judgment of this court requiring Evans & Rogers to deposit with the clerk of this court $1793.33, with interest thereon, "for the use and benefit of the widow and minor children of Charles A. Nelson," was, at least, a partial annulment of the order and decree of distribution theretofore made by the district court of Weber county of the money recovered from the railroad company in the suit mentioned. This court, by thus collaterally impeaching and in effect annulling the order and decree of the district court, clearly acted without jurisdiction. I do not wish to be understood as holding that this court may not, in a proper proceeding, order an attorney and counselor at law licensed to practice before the courts of record of this state, who wrongfully withholds money or funds from his clients, to account to them for such money or funds, and, if he fails to comply with the order, to suspend or permanently disbar him. If this court, when its attention was called to the order and decree of distribution, had refused to be bound by any feature of it, on the ground that it was absolutely void because of the alleged champertous features of the contract under which it was obtained, and had required Evans & Rogers to pay the entire sum retained by them, under the decree, into court, and left them to recover for their services on a *quantum*

*meruit*, it might be argued with much force that, since they were officers of the court, such an order, under the circumstances, would have some legal basis upon which to stand. This court, however, did not make the order requiring Evans & Rogers to pay to the clerk of this court, for the use and benefit of the widow and children, the $1793.33 mentioned, on the ground that the order and decree under which they retained the money was void. The court, by making its order, recognized the validity of the decree of distribution, and, in effect, held that the basis upon which the distribution of the fund was made was inequitable; and the order made was, in effect, a modification of the decree.

No claim was made, nor was there any intimation by anyone at the hearing of the disbarment proceedings, so far as shown by the record, that Evans and Rogers, or either of them, induced the court to make and enter the order and decree of distribution of the money recovered in the suit against the railroad company to the parties entitled thereto through misrepresentation or other unprofessional conduct. In fact, this question, as hereinbefore stated, was not an issue in the proceedings. It was incidentally referred to by David Evans in his testimony regarding the settlement which he claimed he had with Mrs. Nelson and Thomas A. Nelson. In the opinion it is said: "It appears from the record that Alfred H. Nelson, the administrator, was absent from the state when the order of distribution was made; and, while it does not in express terms appear that Evans & Rogers obtained the order of distribution, it is inferable that they did. Whether they did or did not procure the order, they knew of its provisions, and received one-half of the recovery with full knowledge of all the facts in the case. Neither does it appear that the widow, nor anyone legally qualified to act for the minor children, appeared or was represented in the proceeding in which said order was granted, or that Evans & Rogers advised the widow, or any representative of the minor children, that the widow and minor children were entitled to $1793.33 more than allowed them by the order of distribution."

In the absence of any showing to the contrary, the presumption is that the order and decree of distribution made and entered by the district court were regular and proper. (Black on Judgments, sec. 270; 23 Cyc. 1047.) There is absolutely nothing in the record from which it can be inferred that there was any irregularity whatever in the proceedings leading up to and which culminated in the making of the order and decree of distribution. The language of the opinion above set forth, however, seems to imply that some undue advantage was taken of the widow and children by Evans & Rogers, or with their connivance, when the order and decree of distribution was procured. The only evidence in the record on that question was given by Mr. Evans, and is as follows: "Q. The judgment was affirmed by the Supreme Court of the state? A. Yes; and the money was distributed to the proper parties—Mrs. Nelson getting one-half under the contract which we made. Q. It was not paid to A. H. Nelson, as administrator? A. A. H. Nelson had left in the meantime, and these payments were all made under the order of the court—the matter was in the court, and the matter of the estate of Charles A. Nelson, deceased, was pending, and, Nelson being absent, the whole matter was referred to the second judicial district court, . . . and the money distributed in this way under the order of the court. Q. How was the money distributed under the order of the court? A. It was distributed one-half to the widow and her two children and one-half to Evans & Rogers as fees in the case, aside from the witness' fees, clerk's fees, etc., which were recovered that was paid to the several parties entitled to it. Mr. Nelson then, after the money had been recovered, and having refused at that time to do anything, demanded fulfillment of that contract which is marked here 'Exhibit A.' "

And further along in his testimony he said:

"I would like to state right in that connection, too, that at the time I came to settle with Mr. Nelson, to settle with all the parties, they were all present, the widow, Nelson, and all interested; that Nelson insisted that we had made

a contract with him by which we agreed to pay him one-half of our fees in the Saunders Case and one-half in the Nelson Case, and I told him that no such contract was made at all, and he seemed to be somewhat dissatisfied about it, and he figured up all the money which he had expended in procuring witnesses, . . . and he was paid by the parties in the manner which I have suggested, somewhere in ·excess of that which he advanced; and I supposed the thing was all satisfactory until he came in the next day and said he had a contract which we made with him in the Nelson Case, and exacted a settlement for that and . . . stated that if that contract was not fulfilled he would sue us."

The foregoing is the only evidence in the record bearing upon the distribution of the fund in question under the order of the court.

I now come to the question, and the only question, that was in issue in the disbarment proceedings, namely, were the two contracts in question, or either of them, champertous? I refer to the contract entered into by Evans & Rogers and Alfred H. Nelson, on the one hand, and the widow of Charles A. Nelson, on the other, and the contract entered into between Evans & Rogers and Thomas Nelson. I am clearly of the opinion that neither of the contracts was champertous, as the term is now defined and understood. Nor do ᛫ I think that either of them was against sound public policy. The contract under which Evans & Rogers represented the widow and children of Charles A. Nelson in the prosecution of their claim against the railroad company was made with the widow, through Alfred H. Nelson. The evidence, without conflict, shows that she authorized Alfred H. Nelson to make the contract; and the evidence is undisputed that the contract was made before Alfred H. Nelson was appointed administrator of the estate of Charles A. Nelson deceased. Mr. Rogers testified, and the evidence is corroborated by the testimony of other witnesses and not disputed by any, as follows:

"A. H. Nelson, . . . in February, 1892, came into the office of Evans & Rogers, . . . and apprised me of the fact that his brother, Charles Nelson, had been killed in the previous January, while transporting a carload of sheep from Nevada to California, and showed me some letters which he had from the widow of Charles Nelson, asking him to look into the matter or cause of her husband's death, and furnished him in the letter the names of persons who were eyewitnesses to the cause of his death. He also had a newspaper clipping from some Nevada paper, purporting to contain an account of his brother's death and cause of it, and consulted me about it. And the result of the conversation was that he was advised by me to write for further particulars in regard to the matter. He received another letter from his sister-in-law, the widow of Charles Nelson, in which she stated that she placed the matter entirely in his hands as her attorney, and desired him to do everything which was necessary to secure compensation from the Southern Pacific Company for the negligent killing of her husband, and directed him, if he saw fit, to employ other attorneys to assist him in the case. . . . We agreed to make a contract to prosecute the case on behalf of the widow and her minor children against the company for fifty per cent. of whatever sum was recovered, the fifty per cent. compensation to be divided between A. H. Nelson and Evans & Rogers, he to receive one-third, and Evans & Rogers to receive two-thirds. Q. The time that you made this contract, was A. H. Nelson administrator for the estate? A. No, sir. He was appointed administrator afterwards, simply for the purpose of promptly prosecuting the suit on behalf of the widow and children. . . . He was selected on account of the relationship and the fact that he was a brother of the deceased—more for convenience, perhaps, than anything else. . . . Q. After the contract was made with A. H. Nelson and suit was commenced, and he was appointed administrator, state whether or not Nelson left Ogden. A. Yes, sir. . . . He left Ogden in 1893 and before the trial of Nelson v. Southern Pac. Co. . . .

The case was first tried in November or December, 1893; tried at Ogden, and a nonsuit was granted. Q. At that time had you a contract with Thomas Nelson? A. No, sir. Q. That was afterwards? A. Yes, sir. Q. You may state whether, after the nonsuit was granted, you commenced another suit in the name of the administrator for another cause of action. A. Yes, sir; under the same, with A. H. Nelson representing the widow and children, having authority from her to employ attorneys to assist her."

Mr. Evans testified concerning these transactions as follows:

"Q. State, as nearly as you can, Mr. Evans, the terms of that contract. A. I can only state in a general way. The terms of the contract were that we agreed, the three of us, A. H. Nelson and Evans & Rogers, to prosecute that cause for one-half, a contingent fee of one-half. Q. Whom did you agree with? A. We made an agreement with the widow and children, as I understand it. I am not clear about that contract, because I didn't draw it. . . . I did not draw up the contract; but my recollection is that he [Nelson] communicated with his people in Nevada and California, and they agreed there to give one-half to the three of us if we would take the case."

Regarding the understanding that Evans & Rogers had with the widow, Mrs. Nelson, relative to the payment of costs, etc., Mr. Evans testified as follows:

"Mrs. Nelson, being an important witness on the question of damages, appealed to us—that is, Evans & Rogers—for assistance to bring her from California to Utah, in order to give her testimony in the case, and likewise to exhibit whatever interest a widow woman, under the circumstances, would have. She stated to us that she would be glad if we would lend her the money or advance it to her; that she would return it to us whether we won the case or lost it, if she had to earn her money with her needle. Under this appeal Evans & Rogers advanced her the money to bring her here every time she testified in the case, which, I believe, was four times. . . . Mrs. Nellie Nelson was a seam-

stress by trade, had two minor children, and had no income or support whatever, except that which she earned with her needle. . . . The case either had to go by default, or we had to lend money to the widow for the purpose of assisting her in carrying it on. . . . That arrangement, however, was not made with her until after the case was instituted. . . . She returned, after she received her money, every dollar which we had advanced to her, to us—paid us."

The foregoing evidence, which is not disputed in any particular, clearly illustrates the terms of the contract between the widow, on one side, and Evans & Rogers and Alfred H. Nelson, on the other. Under the contract these three attorneys were to receive for their services one-half of any amount recovered from the railroad company for the death of Charles A. Nelson, and the widow and the minor children one-half. The widow did not, as the opinion of this court seems to imply, make a separate and independent contract with Alfred H. Nelson for his services, in which she agreed to pay him one-third of one-half of any amount that might be recovered, and another separate and independent contract with Evans & Rogers for their services, in which she agreed to allow them two-thirds of one-half of any amount that might be recovered. The only inference permissible from the evidence is that the widow made but one contract, and by the terms of that contract she agreed to give the three attorneys mentioned a lump sum of one-half of the amount recovered. No claim was, or is made, that the attorney's fee agreed upon between the parties and later allowed by the district court in its order and decree of distribution of the money recovered from the railroad company was, under the circumstances, unconscionable, or in any sense disproportionate to the services rendered. Therefore, so long as the attorneys safeguarded their clients' interests in the suit against the railroad company and discharged every duty required of them by the terms of the contract, it was no concern of their clients on what basis they divided between themselves the fee received for their services, or, for that mat-

ter, what arrangements they made between themselves regarding the disposition of it.

After the contract referred to was made with the widow, the attorneys reduced to writing the oral agreement they had between themselves regarding the basis upon which the fee should be divided in case of a recovery. Alfred H. Nelson, who was a witness for the state, testified that the contract between himself and Evans & Rogers was "similar" to the Thomas Nelson contract set forth in the foregoing opinion written by Mr. Justice Straup. Mr. Nelson was asked the following question by the Attorney-General: "At the time of making the contract between yourself and Messrs. Evans & Rogers, had you been appointed administrator of the estate of your brother?" And he answered: "I don't remember; I think not, but my recollection is not perfectly clear as to that. I know we talked the matter over about the bringing of a suit for some days, possibly some weeks, before we did anything. We looked the matter up quite carefully. Mr. Horn and myself spent a great deal of time in Evans & Rogers' office looking up authorities and studying the case before we finally decided to do anything." He also testified that he was appointed administrator "simply to facilitate the prosecution of the action with the railroad company." Mr. Evans testified positively that the contract with Alfred H. Nelson was, in substance the same as the Thomas Nelson contract, and that it was executed before Nelson was appointed administrator, and that "he [Nelson] was appointed administrator afterwards, simply for the purpose of promptly prosecuting the suit on behalf of the widow and children. . . . He was selected on account of the relationship and the fact that he was a brother of the deceased—more for convenience than anything else." Rogers testified in relation to these questions, and his evidence is, in substance, the same as that given by Mr. Evans. The only evidence in the record regarding the nature of the contract between Evans & Rogers and Alfred H. Nelson, the time when it was executed with ref-

erence to the time Nelson was appointed administrator, and the reason why he, instead of some other, was appointed, is the evidence of these parties. As stated in the opinion written by Mr. Justice Straup, the case was tried five times in the district court, and was brought to this court three times on appeal. The case was first tried in the district court in November or December, 1893, and the plaintiff was nonsuited. Soon after the trial was had, Alfred H. Nelson left Utah and located permanently in California. Before leaving Utah he and his brother, Thomas Nelson, called upon Evans & Rogers at their offices in Ogden, and after some discussion between the parties the Thomas Nelson contract was entered into under the circumstances and conditions as stated by Mr. Justice Straup in the foregoing opinion.

But few rules of the common law have undergone more sweeping changes in their application than those relating to maintenance and champerty. Under the old common law doctrine the transfer of choses in action was prohibited. The reason for this rule was, as stated by Mr. Chitty in his work on Bills, (section 6), that

"Such alienations tended to increase maintenance and litigation and afforded means to powerful men to purchase rights of action, and thereby enabled them to oppress indigent debtors whose original creditors would not, perhaps, have sued them."

In Ray on Contractual Limitations (page 119) the author, after giving a brief history of the law of maintenance and champerty, says:

"The peculiar state of society out of which such a law grew carried it to the most absurd extremes. Men were held indictable for aiding a litigant to find a lawyer; for giving friendly advice to a neighbor as to his legal rights; for lending money to a friend to vindicate his known legal rights; for offering voluntarily to testify in a pending suit; and other like offices of charity and friendship. It is not surprising, therefore, that the law on this subject has gradually undergone a great change, which is recognized universally by jurists, judges, and law writers everywhere."

And, again, on page 120 the author says:

"This change has been called for by the new conditions of modern society, considered in its varied relations, commercial, political, and sociological. In many of its phases it has been, both in America and England, emphatically discarded as 'inapplicable to the present condition of society, and obsolete.' It is accordingly asserted on high English authority that no one has been punished criminally for the offense of maintenance or champerty within the memory of living man." Stephen, Crim. L. 234.

Warvelle, in his work on Legal Ethics (section 146), says:

"The ancient doctrine of maintenance grew out of conditions which do not exist and never have existed in the United States. Having little or no foundation in reason, it has fallen into disuse; and the general rule now is that any person claiming a right may contract to pay, for legal services rendered in vindicating it, a stipulated portion of the thing, or of the value of the thing, when recovered, the payment to be dependent solely upon such recovery, instead of paying, or contracting to pay, a certain sum and in any event. Such an agreement does not conflict with the law as now administered; nor does it, in any proper sense, contravene any principle of public policy."

And, again, the author, after referring to the arguments generally made against such contracts on ethical grounds (section 150), says:

"It not infrequently happens that persons are injured through the negligence or willful misconduct of others, but who yet, by reason of poverty, are unable to employ counsel to assert their rights. In such event their only means of redress lies in gratuitous service, which is rarely given, or in their ability to find some one who will conduct the case for a contingent fee. That relations of this kind are often abused by speculative attorneys, or that suits of this character are turned into a sort of commercial traffic by the 'personal injury' lawyer, does not destroy the beneficient idea last discussed. So it will be seen that much can be said in favor of contingent fees, viewed solely from an ethical standpoint."

See, also, Archer on Ethical Obligations of the Lawyer, p. 191.

According to the weight of modern authority "champerty is a species of maintenance, 'being a bargain with the plaintiff or defendant to divide land or other matter sued for between them if they prevail at law; whereupon the cham-

pertor is to carry the party suit at his own expense.'" (2 Words and Phrases, 1047.) While there are some decisions to the contrary, the great weight of author- **38** ity is to the effect that, where an "attorney does not undertake to support the litigation at his own expense, or to indemnify the client against costs and charges, but merely agrees to render the ordinary services of an attorney, in consideration of receiving a percentage of the money or thing recovered, . . . that this does not constitute champerty." (6 Cyc. 859, 860, and cases cited in note 41.) And on page 862 of the last-cited volume it is said:

"It is neither against public policy nor champertous for an attorney to loan his client money with which to pay costs of suit, nor to advance money necessary to carry on the suit as needed, when such advances are made as a loan, with the express or implied understanding or agreement for its repayment, and there is no contract of indemnity against the client's liability to pay costs."

This doctrine has been recognized and followed in this jurisdiction. (*Potter v. Ajax Min. Co.*, 22 Utah, 273, 61 Pac. 999.)

In 5 Am. & Eng. L. 829 it is said:

"The doctrine of champerty and maintenance does not prohibit an attorney retained in a case from advancing the necessary incidental costs of litigation; and, even though he advances the money to pay such costs without special agreement, he may recover from his client the amount so advanced."

In 1 Page on Contracts, sec. 339, the author quotes and adopts the language of 4 Blackstone Com. 135, as follows:

"A man may, however, maintain the suit of his near kinsman, servant, or poor neighbor out of charity and compassion, with impunity," and adds: "A parent may supply his daughter with funds to sue, as for breach of promise and seduction. So it is not maintenance for a wife to aid her husband."

(See, also, section 341, same volume.)

In *Brown v. Bigne*, 21 Or. 260, 28 Pac. 11, 14 L. R. A. A. 745, 28 Am. St. Rep. 752, the syllabus, which correctly reflects the doctrine as announced in the opinion, is as follows:

42 Utah 22

"A fair, *bona fide* agreement by a lawyer to supply funds to carry on a pending suit, in consideration of having a share of the property in controversy, if recovered, is not *per se* void, either on the grounds of champerty, as now understood, or of public policy."

So in the case of *Wood v. Casserleigh,* 30 Colo. 287, 71 Pac. 360, 97 Am. St. Rep. 138, it was held that the furnishing of documentary evidence and agreeing to pay expenses of litigation for a contingent fee, the claim being a valid one, is not against public policy. (See, also, *O'Dris- coll v. Doyle,* 31 Colo. 193, 73 Pac. 27.)

There is not a scintilla of evidence in the record that shows, or tends to show, that Evans & Rogers agreed to prosecute the suit against the railroad company at their own expense for the widow and minor children of Charles A. Nelson; but, on the contrary, the evidence, without conflict, shows that after the contract was entered into and the suit commenced Evans & Rogers advanced certain sums of money to the widow to carry on the litigation, with the understanding that she would repay to them the sums so advanced, which she accordingly did. Therefore, under the great weight of authority and the decisions of this court, the contract was not champertous; nor did it in any respect contravene any rule of public policy. (*Potter v. Ajax Min. Co., supra.*) It seems that this court, in determining the character of the contract made with the widow, through Alfred H. Nelson, looked solely to the allegations of the complaint in the suit of *Thomas Nelson v. Evans & Rogers,* instead of considering the terms of the agreement itself, as shown by the evidence in the matter under investigation.

The contract made by Alfred H. Nelson with Evans & Rogers, fixing the basis on which the contingent fee should be divided between them in case of a recovery against the railroad company, under the circumstances, was not in any sense adverse or prejudicial to the interests of the widow and children. Alfred H. Nelson was a brother of the deceased, Charles A. Nelson; and under practically all of the authorities he had the ethical, as well as the legal, right to assist the widow and minor children of

his deceased brother in their suit against the railroad company. The fact that, by the terms of his contract with Evans & Rogers, he was to be paid out of the contingent fee agreed upon, instead of being paid out of the portion of the fund that went to the widow and children, rather inured to the benefit of, than prejudiced, the rights of the widow and children. There can be no question that Evans & Rogers had the right—in fact, it was their duty—to take the necessary steps to procure the presence of witnesses who were familiar with the transaction and circumstances under which Charles A. Nelson lost his life, and, if the witnesses who resided in Nevada, and were outside of the jurisdiction of the court could not be induced to attend the trial in person, to take their depositions. Alfred H. Nelson, being associated with Evans & Rogers as counsel in the case, also had the legal and ethical right to perform those services for which he was to receive no compensation other than the portion (one-third) of the contingent fee agreed upon. Under these circumstances I fail to understand upon what ground it can be successfully claimed that his interests were in any sense antagonistic to those of the widow and children, or upon what theory his contract with Evans & Rogers regarding the portion of the contingent fee he should receive for his services can be held to be champertous or against public policy. As I have stated, the record shows that after the first trial was had the Thomas Nelson contract was entered into. The evidence, without conflict, shows that this contract was "similar" to the contract that Evans & Rogers made with Alfred H. Nelson. Therefore what I have said regarding the validity of the Alfred H. Nelson contract applies with equal force to the Thomas Nelson contract.

I fully concur in the observations made and conclusions reached by Mr. Justice Straup regarding the references made in the opinion under consideration to the *Croco Case,* 18 Utah, 311, 54 Pac. 985, 44 L. R. A. 285. There were, however, some matters involved in the case of *Kennedy v. Oregon Short Line R. Co.,* 18 Utah, 325, 54 Pac. 988, that were pleaded by Evans & Rogers in their

answer in the disbarment proceedings. In that case the plaintiffs, Mrs. Kennedy and her children, three of whom were minors, sought to recover damages from the railroad company for the death of Patrick Kennedy, who was the husband of Mrs. Kennedy and father of the children mentioned, which they claimed was caused by the negligence of the railroad company. Evans & Rogers represented the plaintiffs, and the railroad company was represented by its general counsel, Mr. Williams, who prepared the information in the disbarment proceedings and presented it to this court, and who was also the state's principal witness in the proceedings. It appears that Evans & Rogers had a contract with the widow and children of Mr. Kennedy, the deceased, similar to the contract here involved, by the terms of which they were to be paid a contingent fee, in case a recovery should be had against the railroad company. In their answer filed in the disbarment proceedings Evans & Rogers alleged that, while the Kennedy Case was pending and awaiting trial in the district court at Ogden, Utah, Mr. Williams, counsel for the railroad company, "by himself in person, . . . went to Boise city, in the state of Idaho, . . . to secure from her (Mrs. Kennedy) a settlement without the knowledge or consent of her attorneys, and the said Williams, . . . through duress, deceit (and other improper influences therein mentioned), caused her, the said Margaret Kennedy, to enter into and execute a contract, by which she agreed to settle the same for the sum of $3500; and the said Williams asserted that he did not regard the feelings or legal interest of respondents, or any lawful right whatever which they might have in the premises." The foregoing, as well as other matters of the same import pleaded in the answer, were read into the record by the attorneys representing the state in the disbarment proceedings as part of the examination in chief of the witness Williams, the attorney who represented the railroad company in the Kennedy Case.

Mr. Williams, in giving his testimony in the disbarment proceedings, admitted that he made a settlement with Mrs.

Kennedy without conferring with her attorneys, but denied using improper influences to obtain the settlement, as alleged in the answer. He attempted to justify his actions and course of conduct in that regard on the ground that they (Evans & Rogers) were making a practice of conducting personal injury cases in the courts of this state under contracts made with their clients similar to the contracts in the A. H. Nelson and Kennedy Cases, which he claimed were illegal and champertous. Regarding this matter, Mr. Williams testified in part as follows:

"I stated then, and I state now, that I went and attempted to settle the case with Mrs. Kennedy for the reason that previous to that we had a case tried in which the champertous contract that has been introduced in evidence here was disclosed in that case. . . . The view I took of their position was that they were not entitled to that consideration which I thought members of the profession were ordinarily entitled to receive, and which I was disposed to extend."

The settlement referred to was afterwards repudiated by Mrs. Kennedy, and the money received in payment of her claim was returned to the railroad company. A trial was had, and a judgment was rendered in favor of the plaintiffs in the sum of $7085. The case was appealed to this court and the judgment affirmed. (18 Utah, 325, 54 Pac. 988.)

It will thus be observed that the settlement was obtained for less than half of the amount ultimately recovered by the plaintiffs in the action. Conceding, for the sake of the argument, that Evans & Rogers, in making their contract with the widow and children of Patrick Kennedy, violated the strict letter of the law, it nevertheless, under the circumstances, was a mere technical rather than a substantial infraction. They did not, in either the Nelson Case or in the Kennedy Case, solicit the business. On the contrary, the printed records of those cases, which are on file in this court, show that the plaintiffs in each case sought and obtained the services of Evans & Rogers. In neither of the cases was there any officious intermeddling by Evans

& Rogers, or either of them, such as the law and the ethics of the legal profession denounce. While settlements of pending cases, made with the clients of opposing counsel in the manner and under the circumstances that counsel for the railroad company procured a settlement with Mrs. Kennedy in the case mentioned, may not be in violation of law, nor in contravention of any principle or rule of public policy, they nevertheless are not to be commended. (*Potter v. Ajax Min. Co., supra.*)

In Archer on Ethical Obligations of the Lawyer (page 136), the author says:

"A person who has engaged a lawyer to look after his interests in a given case places the entire matter in his charge. He engages him because he is learned in the law and can protect his clients' rights. It is the right of the client to have all persons representing adverse interests go to the attorney and negotiate with him, rather than try to take advantage of his own lack of technical knowledge of his rights."

The author also quotes with approval canon 9 of the American Bar Association's Code of Ethics, which is as follows:

"A lawyer should not in any way communicate upon the subject of controversy with a party represented by counsel; much less should he undertake to negotiate or compromise the matter with him, but should deal only with his counsel. It is incumbent upon the lawyer most particularly to avoid everything that may tend to mislead a party not represented by counsel, and he should not undertake to advise him as to the law."

In the trial of the cases mentioned, and others of like character, brought by Evans & Rogers, in their capacity of attorneys, in which Mr. Williams represented the defendants, much ill feeling was engendered between them. Evans & Rogers were severely criticised by Mr. Williams because of the alleged champertous character of the contracts under which they prosecuted this class of cases; and, on the other hand, Evans & Rogers characterized the conduct of Mr. Williams, in importuning their clients to settle pending cases against the railroad company without first consulting them, as unprofessional.

I think it may be fairly inferred from the many heated discussions that took place between them in the trial of this class of cases, as shown by the printed records thereof on file in this court, in which bitter personalities were indulged in between them, that the disbarment proceedings were the outgrowth of this ill, and I might add bitter, feeling existing between them. And I think it may be fairly said that, were it not for the feelings of resentment entertained towards Evans & Rogers by Mr. Williams, and Thomas Nelson's desire for "revenge," the proceedings would never have been instituted. While these matters brought out on the hearing before the referee concerning the conduct and method of counsel in conducting or defending, as the case might be, this class of cases can have no possible bearing on the question of the jurisdiction of this court to make the order and render the judgment complained of, they nevertheless tend to explain and to account for, at least to some extent, the action of Mr. Williams and Thomas Nelson in instituting the disbarment. And since these proceedings involved ethical as well as legal questions, I have felt constrained to refer to these matters.

FRICK, J.

I fully concur in the conclusions reached by my Associates for the reasons so ably and exhaustively stated in the foregoing opinions. The only question upon which I had any doubt, namely, the jurisdiction of this court to entertain the application, is so fully answered by Mr. Justice Straup that nothing more need be, nor, indeed, could be, said upon that subject.

The question involved in the application most strongly appeals to my sense of justice. No court should hesitate to correct any wrong arising out of its judgments, when it is within its power to do so. This is especially true with respect to any judgment which affects the honor, integrity, standing, or morals of its officers. While the court should be strict in enforcing the rules of ethics, as they affect the conduct of its officers, yet it should also be ever ready and

quick to correct any wrong that any of its officers may suffer by reason of its judgment, where such correction is possible and legal. In this case it is made apparent that a wrong exists; and it is equally apparent that we have the power to correct it. That the wrong was brought about through inadvertence and with the purest motives of our predecessors, in an effort to reflect justice and to vindicate the law, cannot relieve us from the duty of correcting it. I therefore heartily join my Associates in the foregoing judgment correcting such wrong.